UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


STRYKER CORPORATION AND
HOWMEDICA OSTEONICS CORP.,

        Plaintiffs,

                                File No.  4:01-CV-157

v.

                                HON. ROBERT HOLMES BELL

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA., and
XL INSURANCE AMERICA, INC., formerly
known as WINTERTHUR INTERNATIONAL
AMERICA INSURANCE COMPANY,

        Defendants.
_____/

## **O P I N I O N**

      Plaintiffs Stryker Corporation and Howmedica Osteonics Corp. (collectively "Stryker") seek a declaratory judgment that Defendants National Union Fire Insurance Company of Pittsburgh, PA ("National Union") and XL Insurance America Inc., formerly known as Winterthur International America Insurance Company (XLIA), are obligated to pay the sums incurred in defending and settling more than 70 lawsuits seeking damages for bodily injury allegedly caused by an implanted artificial knee sold by Stryker.  Before the Court are cross-motions for summary judgment by Stryker and National Union.

I.

*Factual Background*

The facts of this case have been more fully set forth in the Court's previous opinions. Stryker and Howmedica seek insurance coverage for claims and lawsuits arising out of bodily injury caused by the implantation of expired Duracon Unicompartmental Knees ® ("Uni-Knee"). The Uni-Knees which give rise to this dispute were manufactured in Limerick, Ireland in 1993. At that time, Howmedica was a subsidiary of Pfizer, Inc. On December 4, 1998, Stryker purchased the assets of Howmedica including the Uni-Knees. Numerous Uni-Knees were sold and implanted beyond their intended shelf-life, giving rise to a number of claims and lawsuits against Stryker (collectively "Underlying Claims"). Stryker has spent over $13.5 million in defending and settling the Underlying Claims.

Stryker purchased two general liability insurance policies relevant to this dispute. The first, from National Union, had a policy period of January 1, 1999 through January 1, 2000. The second policy, from XLIA, provided coverage from January 1, 2000 through January 1, 2001. The policies provide coverage to Stryker and its subsidiaries, including Howmedica.

Under the National Union policy, National Union is liable for "those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay by reason of liability imposed by law or assumed by the Insured under an Insured Contract because of Bodily Injury . . . that takes place during the Policy Period and is caused by an Occurrence . . . ." According to the policy, occurrence means "an accident, including continuous and repeated

2

exposure to conditions, which results in Bodily Injury . . . neither expected or intended from the standpoint of the Insured.  All such exposure to substantially the same general conditions shall be considered as arising out of one Occurrence."   Stryker agreed to provide self insurance of up to $2,000,000 per occurrence with an aggregate limitation of $9,000,000. The National Union Policy covered Stryker for the amount in excess of the retained limit.

*Procedural Background*

In an opinion dated August 27, 2004, the Court denied XLIA's motion for summary judgment on the breach of contract claim finding that Stryker produced evidence that they could establish damages and XLIA failed to establish that Stryker's claims were moot.  In that same opinion, the Court granted National Union's motion for summary judgment on the number of "occurrences" for purposes of coverage under its policy.  The Court determined that each implantation of an expired Uni-Knee was an occurrence.  Thus, under the National Union policy, there were 67 separate occurrences.

Finally, the Court denied Stryker's motion for summary judgment on the duty to defend.  Both insurers argued that Stryker had not exhausted the self-insured retention limits and thus, they were not yet required to defend under the policies.  The Court held that there was a genuine issue of material fact as to whether "bodily injury" occurred during National Union's policy period.  Therefore, there was a genuine issue as to whether Stryker had met their self-insured retention amount.  The Court also denied summary judgment as to XLIA's duty to defend.  The Court held that there was a genuine issue of fact as to whether Stryker

3

knew or suspected that expired Uni-Knees were being implanted and thus whether Stryker's claims were within XLIA's batch coverage. This issue precluded a determination of whether Stryker satisfied XLIA's self-insured retention amount.

In a subsequent opinion dated December 1, 2004, the Court denied XLIA's motion for summary judgment on the issue of coverage. The Court held that there was a genuine issue of fact regarding the definition of the defect in the Uni-Knee, thus the Court could not determine as a matter of law whether Stryker knew or suspected a defect in the Uni-Knee prior to January 1, 2000.

In its present motion, National Union contends that they are entitled to summary judgment on Stryker's claims because Stryker is unable to demonstrate exhaustion of the self-insured retention amounts. Conversely, Stryker seeks summary judgment on their declaratory judgment claim contending that there is no dispute over any element of Stryker's prima facie case for insurance coverage. For the reasons stated below, the Court will grant National Union's motion for summary judgment and deny Stryker's motion for partial summary judgment. Accordingly, the claims against National Union are dismissed. This dismissal, however, is without prejudice.

## II.

The standards upon which the Court evaluates a motion for summary judgment do not change simply because the parties present cross-motions. *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). "The fact that both parties have moved for

summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts." *Id.* (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

Summary judgment is appropriate when the record reveals that there are no issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005); *Layne v. Bank One, Ky, N.A.*, 395 F.3d 271, 275 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The Court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 301 (6th Cir. 2005).

III.

The parties agree Stryker has the burden of proving coverage under the terms of the insurance policy. *See e.g.*, *Harvey Oil Co. v. Federated Mut. Ins. Co.*, 837 F. Supp. 242, 244 (W.D. Mich. 1993) (Bell, J.). In order to prove a prima facie case of coverage, Stryker must show: 1) exhaustion of the self-insured retention amounts, 2) the existence of an Occurrence,

5

3) that caused Bodily Injury during the policy period, 4) for which Plaintiffs are legally obligated to pay. *See* National Union Commercial Umbrella Insurance Policy, Insuring Agreement I, Exhibit A attached to National Union's Motion for Summary Judgment.

National Union has moved for summary judgment regarding 66 of the 67 Underlying Claims based upon Stryker's failure to exhaust the self-insured retention amount under the National Union policy. National Union is not obligated to provide coverage for Stryker's defense and settlement costs until the self-insured retention amounts are exhausted. *See e.g., Frankenmuth Mut. Ins. Co., Inc. v. Continental Ins. Co.*, 450 Mich. 429, 435-36, 537 N.W.2d 879, 881 (1995). National Union contends Stryker is unable to demonstrate exhaustion of either the two million dollar per occurrence limit for any single Uni-Knee claim or the nine million dollar aggregate amount because the Court must apply the *pro rata* "time on the risk" method of allocation to the alleged defense and indemnity costs. *See e.g., Arco Indus. Corp. v. American Motorists Ins. Co.*, 232 Mich. App. 146, 594 N.W.2d 61 (1998). Conversely, Stryker contends that joint and several or "all sums" allocation should be applied to this case.

In order to resolve National Union's motion, the Court must determine the applicable method of allocation. In a diversity case, the Court must apply state law "'in accordance with the then controlling decision of the highest state court.'" *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 517 (6th Cir. 2001) (quoting *United States v. Anderson County, Tennessee*, 761 F.2d 1169, 1173 (6th Cir. 1985)) (quoting *Vandenbark v. Owens-Illinois Glass Co.*, 311

6

U.S. 538, 543 (1941)).  National Union and Stryker agree that Michigan law controls this case.  Accordingly, the Court must apply the law as articulated by the Michigan Supreme Court.  *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938)).

The Michigan Supreme Court, however, has not addressed which method of allocation applies to continuous injury cases.  *See Gelman Sciences, Inc. v. Fid. and Cas. Co.*, 456 Mich. 305, 324, 572 N.W.2d 617, 625 (1998).  Thus, the Court must endeavor to ascertain what the Michigan Supreme Court would decide if faced with this issue.  *Ziegler*, 249 F.3d at 517 (citing *Bailey v. V & O Press Co.*, 770 F.2d 601, 604 (6th Cir. 1985)).  The Court must determine the state law from all relevant data, including the state's appellate court decisions, the dicta of the Michigan Supreme Court, restatements of law, law review commentaries, and the majority rule among other states.  *Garden City Osteopathic Hosp.*, 55 F.3d at 1130 (citing *Angelotta v. American Broadcasting Corp.*, 820 F.2d 806, 807 (6th Cir. 1987)).

The starting point of the Court's analysis is the Michigan Supreme Court's prior decisions.  In *Gelman Sciences* the court noted that the analysis of coverage under an insurance policy must be grounded in the language of the policy.  456 Mich. at 316, 572 N.W.2d at 622.  Where the policy language is clear and unambiguous, a court must enforce the terms as written and not rewrite the plain contract language.  *Id.* at 316, 572 N.W.2d at 623.  Ambiguous provisions, however, must be construed in favor of the policyholder and

7

in favor of coverage. *Id.* The coverage paragraph of the National Union policy provides in pertinent part:

> We [National Union] will pay on behalf of the Insured [Stryker] those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay . . . because of Bodily Injury . . . that takes place during the Policy Period and is caused by an Occurrence happening anywhere in the world.

National Union Commercial Umbrella Insurance Policy, Insuring Agreement I, National Union's Mot. for Summ. Judg. Ex. A. Accordingly the applicable method of allocation must be consistent with the above policy language.

Under the *pro rata* approach, advanced by National Union, insurers are responsible for the portion of the underlying injury that occurred during their policy period, thus coverage is prorated across each period in which damage occurred. *Ins. Co. of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1224-25 (6th Cir. 1980) (applying Illinois and New Jersey law). The court reasoned that "[a]n insurer contracts to pay the entire cost of defending a claim which has arisen within the policy period. The insurer has not contracted to pay defense costs for occurrences which took place outside the policy period." *Id.* Although not denominated as a majority rule, *see Monsanto Co. v. C.E. Health Comp. and Liab. Ins. Co.*, 652 A.2d 30, 35, n. 6 (Del. 1995) (collecting cases), this approach has been followed by certain courts across the country. *See e.g. Olin Corp. v. Ins. Co. of North America*, 221 F.3d 307 (2d Cir. 2000); *Security Ins. Co. of Hartford v. Lumbermens Mut. Cas. Co.*, 826 A.2d 107 (Conn. 2003); *Consol. Edison Co. of New York, Inc. v. Allstate Ins.*

*Co.*, 774 N.E.2d 687 (N.Y. 2002); *Public Service Co. of Colorado v. Wallis & Cos.*, 563 N.W.2d 724 (Colo. 1999).

Stryker's favored approach, "all sums" allocation, holds the insurer on each triggered policy jointly and severally liable where an injury spans multiple policy periods. *Keene Corp. v. Ins. Co. of North America*, 667 F.2d 1034, 1047 (D.C. Cir. 1981). This method has been described as the "majority rule." *See Goodyear Tire & Rubber Co. v. AETNA Casualty & Surety Co.*, 769 N.E.2d 835, 841 (Ohio 2002) (citing *Am. Natl. Fire Ins. Co. v. B & L Trucking & Constr. Co., Inc.*, 951 P.2d 250 (Wash. 1998)). In *Keene*, the court reasoned that "[o]nce triggered, each policy covers [the insured's] liability. There is nothing in the policies that provides for a reduction of the insurer's liability if an injury occurs only in part during a policy period. As we interpret the policies they cover [the insured's] entire liability once they are triggered." *Id.* at 1048; *see also New Castle County v. Hartford Accident & Indemnity Co.,* 933 F.2d 1162 (3d Cir. 1991); *J.H. France Refractories Co. v. Allstate Ins. Co.*, 626 A.2d 502, 507 (Pa. 1993).

Also relevant to this analysis are two decisions of the Michigan court of appeals, *Arco Indus. Corp.*, 232 Mich. App. 146, 594 N.W.2d 61 (1998), and *Dow Corning Corp. v. Continental Casualty Co., Inc.*, 1999 WL 33435067 (Mich. Ct. App. Oct. 12, 1999). These decisions adopted two differing methods of allocation. *Arco Indus.* adopted the *pro rata* "time on the risk" method of allocation, while *Dow Corning* applied the joint and several or

"all sums" approach. *Arco Indus.*, 232 Mich. App. at 165, 594 N.W.2d at 70-71; *Dow Corning*, 1999 WL 33435067 at *6-7.

Although not binding upon the Court, the decisions of the intermediate state appellate courts are relevant data in determining the applicable state law. *See Garden City Osteopathic Hosp.*, 55 F.3d at 1130 (quoting *FL Aerospace v. Aetna Cas. and Sur. Co.*, 897 F.2d 214, 218-19 (6th Cir. 1990)). "[A] federal court may not disregard a decision of the state appellate court on point, unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481, 1485 (6th Cir. 1989), *accord Northland Ins. Co. v. Guardsman Prod., Inc.*, 141 F.3d 612, 617 (6th Cir. 1998). This rule applies whether a state appellate decision is published or unpublished. *Talley v. State Farm Fire and Cas. Co.*, 223 F.3d 323, 328 (6th Cir. 2000); *Upjohn v. Aetna Casualty & Surety Co.*, 768 F. Supp. 1186, 1211 (W.D. Mich. 1990) (Enslen, J.) (selecting the rationale of an unpublished decision after analyzing how the state's highest court would rule on the issue).

In *Arco Indus.*, the court reviewed five methods of allocation including "all sums" and "time on the risk." The court concluded that "time on the risk" was the proper method of apportionment. *Arco Indus.*, 232 Mich. App. at 161, 594 N.W.2d at 69. Based upon *Gelman Sciences*, the court reasoned that "time on the risk" allocation was the "logical corollary" of the "injury in fact" trigger of coverage. *Id*. at 162. "[U]nder the language of the [insurance] policies, coverage was available to Arco when actual property damage occurred 'during the

policy period.'  The logical corollary is that AMICO [the insurer] must provide coverage for damage sustained 'during the policy period,' but not for the years outside the policy period." *Id*.

The court reasoned that because the policy language at issue unequivocally required that injury take place "during the policy period," the joint and several approach was inappropriate because "that method would require AMICO to indemnify Arco for damage occurring outside the policy period." *Id*.  Ultimately, the court concluded that "the intent of the drafters of the policies at issue here, whose language we are required to uphold, was to provide coverage for the policy period only, and not for damages arising before or after the policy period." *Id.*  at 163, 594 N.W.2d at 69.

In contrast, the court in *Dow Corning v. Continental Casualty Co., Inc.*, adopted the "all sums" method of allocation.  The court principally relied upon two provisions of the insurance policy.  First, the court noted that the policy at issue required the insurers to pay "all sums" for which the insured became liable without any "temporal limitation."  *Dow Corning*, 1999 WL 33435067, *6.  Second, the court relied upon specific policy language providing that the insurer would continue to provide coverage after the termination of the policy period ended in the event a covered occurrence continued after the conclusion of the policy.  *Id*.  Specifically, the policy provided:

> [I]n the event that personal injury or property damage arising out of an occurrence covered hereunder is continuing at the time of termination of this policy, the Company will continue to protect the Insured for liability in respect

of such personal injury or property damage without payment of additional premium.

*Id*. at *7.   Based upon the above language, the court concluded that the policy clearly provided for indemnification based upon joint and several allocation.   The court also distinguished *Arco Indus*. based upon the differing policy language in each case. Principally, the policy in *Arco Indus*. did not contain a provision providing that coverage would continue for damages arising out of an occurrence that continued beyond the termination of the policy.  *Id* at *8.    The court also distinguished *Arco Indus*. based upon its failure to distinguish between the trigger of coverage and the scope of coverage.  *Id*.[1]

The Court has reviewed the varying approaches to allocation, mindful that it must predict how the Michigan Supreme Court would rule.  In light of this, the Court holds that if presented with the facts of this case, the Michigan Supreme Court would adopt the *pro rata* "time on the risk" method of allocation applied in *Arco Indus*. and would reject the "all sums" approach adopted in *Dow Corning*.  The Court is led to this conclusion for the reasons that follow.

---

[1]The court in *Dow Corning* also held that *Arco Indus*. did not base its adoption of "time on the risk" allocation on the policy language.  1999 WL 33435067 at *7.  This conclusion overlooks *Arco Indus.*'s reliance upon the "during the policy period" language of the policy. 232 Mich. App. at 162, 594 N.W.2d at 69.  Moreover, the court in *Arco Indus.* concluded, "the intent of the drafters of the policies at issue here, whose language we are required to uphold, was to provide coverage for the policy period only, and not for damages arising before or after the policy period." *Id*. at 163, 594 N.W2d at 70.

First, as the Michigan Supreme Court has instructed, "it is the policy language as applied to the specific facts in a given case that determines coverage." *Gelman Sciences*, 456 Mich. at 316, 572 N.W.2d at 622. In this case, the principal reason for rejecting *Dow Corning* and "all sums" allocation is that the policy language in this case is materially different. The cases adopting joint and several allocation rely upon policy language stating that an insurer covers *all sums* arising out of bodily injury. *See e.g.*, *Keene*, 667 F.2d at 1047; *Goodyear Tire & Rubber Co.*, 95 Ohio St.3d at 516, 769 N.E.2d at 841; *Dow Corning Corp.*, 1999 WL 33435067, *6-7. In this case, National Union is obligated to provide coverage only for "those sums" incurred by Stryker. Exhibit A, National Union's Mot. for Summ. Judg. Thus, the fundamental aspect of the policy language relied upon by courts adopting the joint and several approach is not present in the National Union policy.

Moreover, *Dow Corning* is also distinguishable because the court relied upon a clause mandating that the insurer would continue to provide coverage if an injury continued beyond the time of termination of the policy. 1999 WL 33435067, at *7. Such a clause does not appear in the National Union policy. Based upon this clause and the "all sums" language of the coverage provision, the court in *Dow Corning* concluded that joint and several allocation was proper. *See also Hercules, Inc. v. AIU Ins. Co.*, 784 A.2d 481, 493-94 (Del. 2001) (applying joint and several allocation where policy covered "all sums" and had a similar continuation of coverage clause). While the use of "all sums" and the presence of the continuing coverage clause led the court in *Dow Corning* to conclude that joint and several

13

allocation was proper; the absence of these clauses in the National Union policy leads this Court to conclude that the Michigan Supreme Court would not adopt joint and several allocation in this case.

Second, pro rata allocation is consistent with the policy language in this case. The policy language obligates the insurer to provide coverage for the policy period only, not for damages arising before or after the policy period. *Arco Indus.*, 232 Mich. App. at 163, 594 N.W.2d at 70. *See also Forty-Eight Insulations, Inc.*, 633 F.2d at 1224-25; *Sec. Ins. Co. of Hartford*, 826 A.2d at 121; *Consolidated Edison Co. of New York*, 774 N.E.2d at 695 ("joint and several allocation is not consistent with the language of the policies providing indemnification for 'all sums of liability that resulted from an accident or occurrence *during the policy period*' . . . [T]he policies provide indemnification for liability incurred as a result of an accident or occurrence during the policy period, not outside that period.") (citing *Olin Corp.*, 221 F.3d at 323; *Forty-Eight Insulations*, 633 F.2d at 1224)) (emphasis in original). Additionally, the coverage provision of the National Union policy is not ambiguous, it requires coverage for liability resulting from a bodily injury during the policy period. *See Sec. Ins. Co. of Hartford*, 826 A.2d at 121 ("[W]e do not agree with those courts concluding that the insurance contract language at issue in this case is so ambiguous as to how to allocate defense costs in long latency loss claims that it will bear the interpretation that the insurers should be liable for injuries that do not occur during the policy period . . . ."); *Consol. Edison Co. of New York, Inc.*, 774 N.E.2d at 694-95; *Owens-Illinois, Inc. v. United Ins. Co.*, 650

14

A.2d 974, 989 (N.J. 1994). *See also Gelman Sciences*, 456 Mich. at 318, 572 N.W.2d at 623 ("We must not create an ambiguity [in the policy language] where none exists. Further, we may not rewrite the plain and unambiguous language under the guise of interpretation.").

Third, pro rata "time on the risk" allocation is also consistent with the "injury in fact" trigger of coverage adopted by the Michigan Supreme Court in *Gelman Sciences*, 456 Mich. at 319-20, 572 N.W.2d at 623-24. *See Northern States Power Co. v. Fid. & Cas. Co. of New York*, 523 N.W.2d 657, 662 ("[T]he choice of trigger theory is related to the method a court will choose to allocate damages between insurers . . . ."). *Arco Indus.* noted that pro rata allocation logically followed from *Gelman Sciences'* adoption of the injury in fact trigger of coverage leading the court to conclude that requiring the insurer to provide coverage on an "all sums" basis would be inconsistent with the "during the policy period" policy language. 232 Mich. App. at 161-62, 594 N.W.2d at 69. *See also Northern States Power Co.*, 523 N.W.2d at 662 ("A [joint and several] allocation is inconsistent with the [injury in fact] trigger theory."); Tung Yin, Comment, *Nailing Jello to a Wall: A Uniform Approach for Adjudicating Insurance Coverage Disputes in Products Liability Cases with Delayed Manifestation Injuries and Damages*, 83 CAL. L. R. 1243 (1995) (advocating the adoption of the injury in fact trigger of coverage and pro rata allocation between multiple triggered insurance policies). Thus, the Michigan Supreme Court would likely adopt *pro rata* "time on the risk" allocation because it is consistent with its previous adoption of the "injury in fact" trigger of coverage.

Finally, the Court also notes the inherent simplicity and predictability of the *pro rata* "time on the risk" allocation method.  *See* Michael G. Doherty, Comment, *Allocating Progressive Injury Liability Among Successive Insurance Policies*, 64 U. CHI. L. REV. 257, 281-83 (1997) ("The time-on-the-risk method should be adopted by courts because its inherent simplicity promotes predictability, reduces incentives to litigate, and ultimately reduces premium rates . . . . The time-on-the-risk method has intuitive, commonsense appeal . . . .").  In this case, pro rata "time on the risk" can easily and fairly be applied to allocate Stryker's damages between the National Union and XLIA polices.  Accordingly, the Court holds that the Michigan Supreme Court, if faced with the issue, would adopt the pro rata "time on the risk" allocation method to apportion damages in this case.[2]

IV.

Applying the pro rata "time on the risk" allocation method to this case, it appears that Stryker is unable to satisfy the self-insured retention limit for the 66 Underlying Claims.  National Union submitted a chart allocating Stryker's defense and settlement expenditures between the National Union and XLIA policy periods.[3]  The combined allocated expenditures

---

[2]The Court also notes that this conclusion is consistent with the previous holdings of this Court.  *See Century Indemnity Co. v. Aero-Motive Co.*, 318 F. Supp.2d 530, 545 (W.D. Mich. 2003) (Quist, J.) (holding that insurance defense costs should be apportioned consistent with *Arco Indus.* and rejecting *Dow Corning* because the policy at issue did not contain language obligating the insurer to pay damage continuing at the time of termination of the policy); *Tiscornia v. Travelers Corp.*, 1996 U.S. Dist. LEXIS 17691, *27 (W.D. Mich. Oct. 28, 1996) (Enslen, C.J.).

[3]In their response, Stryker made certain objections to the allocation charts submitted by National Union.  National Union has resubmitted updated charts that purportedly

16

for the 66 Underlying Claims is $4,037,107.47, nearly $5,000,000 below the $9,000,000 self-insured retention aggregate that applies to this case.  *See* August 27, 2004 Opinion, Docket #603.  Moreover, no single claim approaches the $2,000,000 per occurrence self-insured retention limit.  *See* Exhibit B and C attached to National Union's Reply Brief.[4] Accordingly, based upon this evidence it appears that Stryker has failed to meet the necessary threshold to trigger National Union's coverage obligation for these 66 claims.

Stryker contends that even if pro rata "time on the risk" is applied, National Union is not entitled to summary judgment on the declaratory judgment claim.  They argue that even if they have not yet exhausted the required self-insured retention amount, they are likely to do so in the future because approximately 100 individuals who received defective Uni-Knees have not yet asserted claims and may do so in the future.

In addition, Stryker also asserts that a recent judgment amount against them in *Pfizer v. Stryker*, case no. 02-cv-8613 (S.D.N.Y.), should be included in the amounts allocated between the National Union and XLIA policies.  On March 24, 2005, a jury reached a verdict against Stryker and in favor of Pfizer concluding that Stryker must indemnify Pfizer for all

_____

incorporate Stryker's objections.  *See* Docket #675 Exhibits B and C attached to National Union's Reply Brief.  Moreover, the allocation chart adopts Stryker's view that bodily injury occurred from the date of implantation until removal of the device.  This is contrary to National Union's asserted position, but for purposes of their motion, National Union has accepted Stryker's view.  Including Stryker's objections and adopting their bodily injury theory gives every benefit of doubt to Stryker on this motion.

[4]The largest allocated sum for a single occurrence is the Ira Seiler claim in which $306,488.58 was expended.

settlements and defense costs incurred by Pfizer in defending suits involving Uni-Knees

implanted after December 4, 1998.  Stryker contends that when the judgment in favor of

Pfizer and the over 100 remaining patients who received defective Uni-Knees are included,

the self-insured retention amount would be exceeded, even under pro rata "time on the risk."

Stryker's liability to Pfizer is not part of the present lawsuit.  This issue was clearly

addressed in the Court's Seventh Case Management Order:

> Defendants' liability to defend or indemnify plaintiffs for claims of Pfizer that
> are the subject of *Pfizer v. Stryker*, case no. 02-cv-8613 (S.D.N.Y.) under the
> insured contract provision of the policies have never been the subject of the
> pleadings or discovery in the present case and will not be litigated herein.
> Plaintiffs remain free to raise such claims in a separate lawsuit, subject to
> possible collateral estoppel effects of determinations in the present case.

*Stryker v. National Union Fire Insur. Co. of Pittsburgh, Pa.*, 4:01-cv-157 (W.D. Mich.)

(Docket #625).  Stryker did not object to the Magistrate Judge's resolution of this matter.

*See* FED. R. CIV. P. 72(a) ("Within 10 days after being served with a copy of the magistrate

judge's order, a party may serve and file objections to the order; a party may not thereafter

assign as error a defect in the magistrate judge's order to which objection was not timely

made.").  As has become far too common between the parties in this case, Stryker appears

to be ignoring the Court's order and attempting to include these claims in the present suit by

making an end-run around the Case Management Order.  This issue has been decided.

Stryker's indemnity to Pfizer is not part of this lawsuit.[5]

---

[5]Stryker should be credited with, at least, partial recognition of the Case Management
Order because they have filed another lawsuit in this Court encompassing the Pfizer

18

The Court now turns to the approximately 100 patients who received defective Uni-Knees but have not asserted a claim against Stryker. Stryker contends that a declaratory judgment can encompass these potential claims because "neither immediate liability for damages nor a liquidation of an insurer's obligation is necessary to establish a justiciable controversy under the Declaratory Judgment Act." *Employers Ins. of Wausau v. McGraw-Edison Co.*, 1987 WL 58061, at *3 (W.D. Mich. Aug. 8, 1987) (Gibson, J.) (citing *Riehl v. Travelers Ins. Co.*, 772 F.2d 19 (3d Cir. 1985); *Keene Corp.*, 667 F.2d 1034; *AC & S v. Aetna Cas. & Sur. Co.*, 666 F.2d 819 (3d Cir. 1981)). National Union, however, argues that the future claims are not part of this lawsuit and invite an advisory opinion from the Court.

"District courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act . . . ." *AmSouth Bank v. Dale*, 386 F.3d 763, 784 (6th Cir. 2004) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995)). In order for a declaratory judgment to be appropriate under the Act, an "actual controversy" must exist. 28 U.S.C. § 2201; *Heydon v. MediaOne of Southeast Michigan, Inc.*, 327 F.3d 466, 469 (6th Cir. 2003).

The potential Uni-Knee claims are not part of this action and are not before the Court. Therefore, they cannot be included in Stryker's request for declaratory relief. At best, the approximately 100 patients who received defective Uni-Knees are *potential claimants*. As

---

indemnity claims. *See Stryker v. National Union Fire Ins. Co. of Pittsburgh, Pa*, 1:05-cv-51 (W.D. Mich. 2005).

such, they do not represent an "actual controversy" necessitating the entry of a declaratory judgment. 28 U.S.C. § 2201. There is no evidence in the record regarding these potential claimants. It is reasonable to assume that some of the remaining patients have not suffered an injury and may never develop a problem. Further, some of these potential claimants may never assert a claim against Stryker. In fact, it can reasonably be assumed that a certain number of these patients have already died.

Stryker contends that this case is analogous to this Court's decision in *Employers Ins. of Wausau v. McGraw-Edison Co.*, in which the Court held that there was a justiciable controversy under the Declaratory Judgment Act where an insured sought a declaration of insurance coverage against various primary and excess insurers for liability incurred as a result of soil and water contamination. 1987 WL 58061, at *3. The Court reasoned that a justiciable controversy existed because "[t]he events giving rise to insurance coverage have already occurred." *Id.* That is, the land and surface water were contaminated, federal and state environmental agencies had already determined that the insured was responsible for the contamination, and the only event yet to occur was the liquidation of the insured's liabilities at each site. *Id.* Stryker argues that, similar to *McGraw-Edison*, the only remaining issue in this case is the number of potential claims that will materialize in the future. Further, Stryker asserts that the event giving rise to coverage – the accidental failure of the inventory tracking system – has already occurred.

Stryker's reliance upon the failure of the inventory tracking system as the "event giving rise to insurance coverage" is misplaced. According to the policy, occurrence means "an accident, including continuous and repeated exposure to conditions, which results in Bodily Injury . . . neither expected or intended from the standpoint of the Insured." The need for coverage does not arise until an occurrence takes place and a claim is asserted. With regard to the potential claims, while it can be assumed that implantation of the defective product has taken place, there is no evidence that this resulted in any bodily injury to the patient. Thus, an "occurrence" has not yet taken place. Unlike *McGraw-Edison*, in this case certain events giving rise to coverage for the potential claims have yet to occur.[6] At best, these potential claims invite the Court to speculate on whether additional claims will ever be asserted and whether Stryker will ever exceed the self-insured retention amounts. The Court must decline this invitation. Accordingly, the potential claims are not before the Court and cannot be included in the request for declaratory relief.

V.

Absent the Pfizer judgment and the potential claims, Stryker is unable to show exhaustion of the self-insured retention amounts. Because Stryker has failed to demonstrate

---

[6]Stryker's reliance upon the failure of the tracking system as the sole event giving rise to coverage is troubling for another reason. It largely ignores the unresolved material issues of fact present in this case. *See e.g.*, August 27, 2004 Opinion at 11-12. A review of the record in this case reveals that it is far from certain that the only remaining issue is the number of potential claims that may be asserted. This is another indication that the potential claims are not presently ready for adjudication.

21

the exhaustion of the self-insured retention amounts, National Union is not obligated to provide insurance coverage.  Accordingly, National Union's motion for summary judgment on the 66 Underlying Claims is granted and Stryker's motion for partial summary judgment on their request for a declaratory judgment is denied.[7]  The claims against National Union are dismissed.  The Court notes, however, that in the event additional claims against Stryker materialize and the self-insured retention amount is exceeded, the case may be reopened.  Accordingly, the dismissal of the claims against National Union is without prejudice.

Date: _____July 1, 2005_____          /s/ Robert Holmes Bell_____
                                           ROBERT HOLMES BELL
                                           CHIEF UNITED STATES DISTRICT JUDGE

---

[7]National Union has also moved for summary judgment on the only unresolved Uni-Knee claim against Stryker (the "Scully Claim").  It appears to be highly unlikely and only remotely possible that the defense and settlement expenditures arising from the Scully Claim will in any way approach the required self-insured retention amounts.  Accordingly, National Union's motion for summary judgment on the Scully Claim is also granted.