UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STRYKER CORPORATION and
HOWMEDICA OSTEONICS CORP.,

        Plaintiffs,

                                     File No.  4:01-CV-157

v.

                                     HON. ROBERT HOLMES BELL

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA and
XL INSURANCE AMERICA, formerly
known as WINTERTHUR INTERNATIONAL
AMERICA INSURANCE COMPANY,

        Defendants.

_____/

## **O P I N I O N**

       This matter is before the Court on two motions for summary judgment.  Plaintiffs

Stryker Corporation and Howmedica Osteonics Corp. (collectively "Stryker") seek partial

summary judgment against Defendant XL Insurance America ("XLIA") on the prima facie

case of insurance coverage, on XLIA's affirmative defenses nos. 1-6, 9-13, and 15-18, on

whether the defective medical products in this case constitute a "batch" under the XLIA

policy, and on the issue of whose knowledge is relevant in determining if coverage is

excluded under the policy.  XLIA has filed a motion for summary judgment contending that

Stryker has failed to sustain their burden of establishing insurance coverage.  For the reasons

that follow, XLIA's motion is denied and Stryker's motion is granted in part and denied in

part.

I.

In this action, Stryker seeks a declaratory judgment that XLIA and Defendant National Union Fire Insurance Company of Pittsburgh, PA ("National Union") failed to defend and indemnify Stryker against approximately 75 lawsuits seeking damages for bodily injury allegedly caused by an implanted artificial knee.[1]  To date, Stryker has incurred over $13,500,000 in costs defending and settling the underlying claims.

The defective medical product at issue in this case is the Duracon Unicompartmental Knee ® ("Uni-Knee") that was manufactured by Howmedica, Inc.  In particular, the Uni-Knees giving rise to this dispute were manufactured in Limerick, Ireland in 1993.[2]  The Uni-Knees were made of metal and ultrahigh molecular weight polyethylene, sterilized with gamma radiation and stored in packages containing air.  During the mid-1990's medical studies revealed that gamma radiated ultrahigh molecular weight polyethylene that was stored in air lost its strength over time due to oxidation of the components.  Although Howmedica, Inc. established a shelf-life policy and tracking system for products containing polyethylene, the Uni-Knees were inadvertently omitted from the system.  As a result, numerous Uni-Knees were sold and implanted beyond their intended shelf-life giving rise to a number of claims and lawsuits against Stryker (collectively "Underlying Claims").

---

[1]In an opinion dated July 1, 2005, the Court granted summary judgment in favor of National Union, dismissing them from this lawsuit.  Docket #685.  Accordingly, XLIA is the sole remaining defendant in this case.

[2]At that time, Howmedica, Inc., was a subsidiary of Pfizer, Inc.  On December 4, 1998, Stryker purchased Howmedica, Inc., including the inventory of Uni-Knees, creating Howmedica Osteonics Corp., a wholly-owned subsidiary of Stryker.

Stryker contends that the claims arising from the implantation of the expired Uni-Knees are covered by an insurance policy purchased from XLIA. XLIA sold Stryker a general liability insurance policy with a policy period of January 1, 2000 through January 1, 2001. The policy provides coverage to Stryker and its subsidiaries, including Howmedica Osteonics, for "those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay . . . because of Bodily Injury . . . that takes place during the Policy Period and is caused by an Occurrence happening anywhere in the world." Exhibit 1, Commercial Umbrella Policy, Insuring Agreements I, XLIA's Mot. Summ. J. (Docket #634). The XLIA policy also contains a specific endorsement addressing medical products. "With respect to implantable medical products only, occurrence shall mean the explant of such medical product." *Id.*, Endorsement 15 (hereinafter "the Medical Products Endorsement"). The endorsement also defines "explant" as "the removal or replacement of an implantable medical product." *Id.* at ¶ 1.

The Medical Products Endorsement also states that for purposes of determining the limits of insurance and the self-insured retention amounts, "all Bodily Injury . . . included in the Products Hazard and which arises out of one batch of [Stryker's] Products shall be considered one occurrence." *Id.* at ¶ 2. Under the policy, "batch" means all medical products which have the same known or suspected defect which is identified by the same advisory memorandum. *Id.* at ¶ 3. In addition, the date of the advisory memorandum is considered the date of occurrence for all claims resulting from or relating to the batch. *Id.* Batch coverage, however, is excluded where the loss, "arises out of a defect, [sic] or deficiency that

3

is known or suspected" prior to January 1, 2000, the effective date of the policy.  *Id*.  An

"advisory memorandum" is any public communication by an officer of Stryker with a

primary purpose of informing recipients of a risk of substantial harm from a medical product.

*Id*.  Both sides agree that a July 28, 2000 letter signed by Ned Lipes, an officer of Stryker and

Howmedica Osteonics, is the "advisory memorandum" that defines the defect or deficiency

in the Uni-Knees.  *See* December 1, 2004 Opinion at 3 (Docket #619); XLIA's Br. Supp. of

Summ. J. on Coverage at 3 (Docket #534); Stryker's Res. to XLIA's Mot. Summ. J. on

Coverage at 12 (Docket #590).  The policy also included a two million dollar per occurrence

and nine million dollar aggregate self-insured retention amount.

Stryker contends that the purpose of their present motion is to narrow the issues for

trial by eliminating issues on which there is no genuine issue of material fact.  In the Court's

previous opinion dated December 1, 2004, the Court identified two issues of fact for the jury:

1) what is the definition of the defect or deficiency in the Uni-Knee, and 2) did Stryker know

or suspect the defect or deficiency prior to January 1, 2000?  Stryker argues that these are the

only triable issues and the Court should enter summary judgment in their favor on 1) each

element of the prima facie case of coverage, 2) XLIA's affirmative defenses nos. 1-6, 9-13,

and 15-18, 3) whether there is a "batch" of Uni-Knees in this case and 4) the issue of whose

knowledge is relevant under the Medical Products Endorsement.  Conversely, XLIA asserts

in their motion for summary judgment that Stryker has failed to produce evidence

establishing the elements of coverage under the policy.  Thus, XLIA contends they are

entitled to summary judgment on Stryker's claims.

4

II.

The standards upon which the Court evaluates a motion for summary judgment do not change simply because the parties present cross motions. *Relford v. Lexington-Fayette Urban County Gov't*, 390 F.3d 452, 456 (6th Cir. 2004). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts." *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

Summary judgment is appropriate when the record reveals that there are no issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005); *Layne v. Bank One, Ky, N.A.*, 395 F.3d 271, 275 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Tucker v. Union of Needletrades, Industrial and Textile Employees*, 407 F.3d 784, 787 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The Court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in the favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Minadeo v. ICI Paints*, 398 F.3d 751, 756 (6th Cir. 2005).

When the party without the burden of proof seeks summary judgment, that party bears the initial burden of pointing out to the district court an absence of evidence to support the non-moving party's case, but need not support its motion with affidavits or other materials "negating" the opponent's claim. *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the non-moving party has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Although the facts are viewed in the light most favorable to the non-movant, they may not rest on the mere allegations of his pleadings. FED. R. CIV. P. 56(e); *Daniel v. Cantrell*, 375 F.3d 377, 381 (6th Cir. 2004). "A mere scintilla of evidence is insufficient." *Humenny v. Genex Corp.*, 390 F.3d 901, 904 (6th Cir. 2004). Rather, a party with the burden of proof opposing a motion for summary judgment has the burden to come forth with requisite proof to support his legal claim, particularly where he has had an opportunity to conduct discovery. *See Cardamone v. Cohen*, 241 F.3d 520, 524 (6th Cir. 2001).

When the moving party has the burden of proof, however, a somewhat different standard applies. "[W]here the moving party has the burden – the plaintiff on a claim for relief or defendant on an affirmative defense – his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). The Sixth Circuit has explained that the party with the burden

of proof faces "a substantially higher hurdle" when seeking summary judgment in his favor. *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002) (quoting *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001)).  The moving party's initial summary judgment burden is higher, "in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Id.* (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000)).  Thus, "[s]ummary judgment in favor of the party with the burden of persuasion, however, is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

III.

Although this case is complex in itself, the parties have injected additional (and often unnecessary) complexity into it by disputing nearly every contention by their opponent, often in conflict with their previous submissions to this Court.  That said, it is the Court's task to untangle the dispute and attempt to discern the remaining material issues of fact for trial. The Court will first address XLIA's motion for summary judgment.

A.     XLIA's "No Evidence" Motion for Summary Judgment

The parties agree that Stryker bears the burden of proving coverage under the terms of the insurance policy.  *See e.g.*, *Harvey Oil Co. v. Federated Mut. Ins. Co.*, 837 F. Supp. 242, 244 (W.D. Mich. 1993) (Bell, J.).  In order to prove coverage under the XLIA policy, Stryker must show: 1) they are legally obligated to pay "those sums in excess of the Retained

Limit", 2) as a result of "bodily injury" during the policy period, and 3) caused by an "occurrence."   *See* Exhibit 1, Commercial Umbrella Policy, Insuring Agreements I. Coverage, XLIA's Mot. Summ. J. (Docket #628).  The policy defines "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in Bodily Injury . . . neither expected nor intended from the standpoint of the Insured."  *Id*. Insuring Agreements IV. Definitions.  The parties agree, however, that this definition is modified by the Medical Products Endorsement.  The Medical Products Endorsement provides "[w]ith respect to implantable medical products only, occurrence shall mean the explant of such medical product."  The endorsement goes on to define "explant" as "the removal or replacement of an implantable medical product."  Medical Products Endorsement ¶ 1.

Based upon this definition of "occurrence," XLIA contends that in order to establish coverage, Stryker must show that they are legally obligated to pay sums in excess of the Retained Limit because of bodily injury during the policy period and caused by "the removal or replacement of an implantable medical product."  *See* Ex.1 and the Medical Products Endorsement ¶ 1.  While Stryker acknowledges that the definition of "occurrence" in the Medical Products Endorsement applies in this case, they assert that XLIA's interpretation is contrary to the intent of the policy and the Medical Products Endorsement because it narrowly limits coverage to bodily injury caused by the explant of a Uni-Knee.  Further, they argue that the Medical Products Endorsement was intended solely to address the issue of when coverage is triggered under the policy.

Under Michigan law, insurance contracts are interpreted in accordance with Michigan's well-established principles of contract construction. *Henderson v. State Farm Fire & Cas. Co.*, 460 Mich. 348, 353-55, 596 N.W.2d 190, 193-94 (1999). "The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties." *Fromm v. Meemic Ins. Co.*, 264 Mich. App. 302, 311, 690 N.W.2d 528, 533-34 (2004) (quoting *McIntosh v. Groomes*, 227 Mich. 215, 218, 198 N.W. 954 (1924)). The contract itself is "the best evidence of the parties intent." *United Rentals (North America), Inc. v. Keizer*, 202 F.Supp.2d 727, 735 (W.D. Mich. 2002).

In construing an insurance contract, the court must read the contract as a whole, giving meaning to all the terms in the policy. *Shefman v. Auto-Owners Ins. Co.*, 262 Mich. App. 631, 637, 687 N.W.2d 300, 303 (2004) (citing *Auto-Owners Ins. Co. v. Churchman*, 440 Mich. 560, 566, 489 N.W.2d 431, 434 (1992)). When the contract terms are plain and unambiguous, the court must enforce the contract as written. *Henderson*, 460 Mich. at 354, 596 N.W.2d at 193. The Court must avoid creating ambiguity in an insurance policy under the guise of interpretation where the contract terms are clear. *Old Life Ins. Co. of America v. Garcia*, 411 F.3d 605, 613 (6th Cir. 2005); *Churchman*, 440 Mich. at 567, 489 N.W.2d at 434. Where a contract is ambiguous, however, the meaning is a question of fact for the jury. *Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 467, 663 N.W.2d 447, 453 (2003); *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 455 (6th Cir. 2003) (citing *D'Avanzo v. Wise & Marsac, P.C.*, 223 Mich. App. 314, 319, 565 N.W.2d 915, 917 (1997)). "An insurance contract is ambiguous if, after reading the entire contract, its language can be

reasonably understood in different ways." *Steinmann v. Dillon*, 258 Mich. App. 149, 154, 670 N.W.2d 249, 252 (2003); *Farm Bureau Mut. Ins. Co. of Michigan v. Nikkel*, 460 Mich. 558, 566, 596 N.W.2d 915, 919 (1999).

After reviewing the XLIA insurance policy it is apparent that the meaning of the Medical Products Endorsement and the coverage provision is ambiguous. The policy and Medical Products Endorsement are not plainly and clearly drafted. Certain clauses of the contract are written in passive voice and often contain improper punctuation. This results in a policy which is susceptible to multiple conflicting interpretations. Thus, the meaning of this ambiguous contract is a question of fact for the jury. *Klapp*, 468 Mich. at 469, 663 N.W.2d at 454 (quoting *O'Connor v. March Automatic Irrigation Co.*, 242 Mich. 204, 210, 242 N.W. 784, 787 (1928)).

At first glance, XLIA's interpretation appears plausible. The Uni-Knee is an implantable medical product, thus, the first sentence of the Medical Products Endorsement directs that "occurrence" means an "explant" of the medical product. Therefore, this definition applies where "occurrence" appears in the coverage provision of the policy. Thus, XLIA is able to reason that bodily injury from an explant is required for coverage. When the first sentence from the Medical Products Endorsement is read in concert with the coverage provision in isolation, XLIA's interpretation appears reasonable. But the Court must interpret the contract as a whole and give meaning to each provision of the policy. *Churchman*, 440 Mich. at 566, 489 N.W.2d at 434; *Keizer*, 202 F. Supp.2d at 735. The problem with XLIA's interpretation is that it ignores the remainder of the paragraph in which

the definition of "occurrence" is contained.  After setting out the definition of "occurrence" and "explant" the endorsement continues:

> "[i]n the event no explant shall occur, the date of occurrence shall be deemed to be the earlier of the date a) a claim is made or suit is brought alleging injury or damage resulting from such a medical product, b) a professional opinion is rendered which provides a basis for a claim under the coverage provided, c) medical expenses are incurred as a result of the alleged injury or damage or d) death occurs allegedly as a result of a defective medical product."

Medical Products Endorsement. This clause establishes that if no explant occurs, there is still an occurrence under the policy.  Thus, it appears that coverage is available in the absence of an explant.  This is in direct conflict with XLIA's interpretation of the coverage provision and Medical Products Endorsement.  Under XLIA's interpretation there would be no need to include this provision. *See Klapp*, 468 Mich. at 453, 663 N.W.2d at 468 ("courts must also give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory."); *Union Ins. Co. v. Fidelity & Deposit Co. of Maryland*, 549 F.2d 1107, 1110 (6th Cir. 1977).  Moreover, in paragraph three of the Medical Products Endorsement addressing batch coverage and the date of occurrence for a batch, it states "[f]or an individual explant of [sic] claim to be considered part of a batch, the date of occurrence, as defined in Paragraph 1., above, must be subsequent to 1-1-00."[3]  This reference to explants *as well as claims* also conflicts with XLIA's view that coverage applies only where bodily injury is caused by an explant.

These are just two examples of the conflicts and ambiguity inherent in the policy and

_____

[3]The reference to "individual explant of claim" appears to be a typo and should be "or claim."

Medical Products Endorsement.  As such, the meaning of the Medical Products Endorsement and the coverage provision is a question of fact for the jury.  *Fromm v. Meemic Ins. Co.*, 264 Mich. App. 302, 311, 690 N.W.2d 528, 533 (2004) ("An insurance contract is deemed ambiguous when its provisions are capable of interpretations that conflict.").  Therefore, XLIA's "no evidence" motion for summary judgment is denied.

B.     Stryker's Motion for Partial Summary Judgment

     1. Stryker's Prima Facie Case of Coverage

In light of the Court's determination that the meaning of the coverage provision and Medical Products Endorsement are ambiguous, a grant of summary judgment in favor of Stryker on the elements of coverage would be improper.  Accordingly, Stryker's motion for summary judgment on the prima facie case of coverage is denied.

     2. XLIA's Affirmative Defenses Nos. 1-6, 10-12, and 15-18

Stryker also seeks summary judgment regarding XLIA's Affirmative Defenses nos. 1-6, 10-12, and 15-18.  In response, XLIA indicated that these affirmative defenses were not being pursued.  Therefore, Stryker's motion for summary judgment is granted.

     3. XLIA's Affirmative Defense No. 9

Stryker has also moved for summary judgment on XLIA's ninth affirmative defense in which XLIA contends that the policy does not provide coverage for claims that Stryker failed to provide XLIA with timely written notice.  XLIA limited this affirmative defense to

12

so-called "Pfizer Claims."[4]  Exhibit 3, XLIA's Ans. Interrog. No. 20 at 55, Stryker's Part.

Mot. Summ. J.  Before determining if summary judgment is appropriate on this affirmative

defense the Court must decide whether the Pfizer Claims are in fact part of this lawsuit.

Stryker contends that XLIA has wrongfully assumed that Stryker is not seeking

coverage or defense costs for the Pfizer Claims.  Stryker argues that XLIA's assumption

arises from a misreading of Stryker's responses to requests for admissions.  Specifically,

Stryker highlights XLIA's Request for Admission No. 155 in which XLIA requests an

admission that Stryker is "not seeking insurance coverage . . . for the liabilities associated

with the Uni-Knee devices sold by Howmedica, Inc. before the sale of assets to Stryker."

Exhibit 9, Stryker's Part. Mot. Summ. J. at pg. 45.  Stryker responded:

> Plaintiff admits that it is not seeking insurance coverage for liabilities
> associated with the Uni-knee devices sold by Howmedica, Inc. prior to
> December 4, 1998 and for which Pfizer has agreed to indemnify Striker [sic]
> or Howmedica Osteonics.  Otherwise, this request is denied.

---

[4]According to Stryker, the Pfizer Claims are claims and lawsuits involving Uni-Knees that were implanted before Stryker's purchase of Howmedica, Inc. from Pfizer. Stryker explains that at the outset of this matter, Pfizer accepted responsibility for indemnifying Stryker for  the Pfizer Claims.  *See* Feb. 18, 2004 email, Exhibit B Stryker's Reply Br.  In 2003, however, Pfizer refused to pay defense costs for certain Pfizer Claims.  *Id*.  Stryker contends that they are entitled to coverage from XLIA for the claims rejected by Pfizer.  There are sixteen Pfizer Claims, see Exhibit 3, XLIA's Ans. to Interrog. No. 6 pg. 30, however, Stryker is only seeking coverage for three claims.  See Stryker's Reply Br. at 4-5.

These claims are distinguished from the claims of Pfizer that are the subject of *Pfizer v. Stryker*, case no. 02-cv-8613 (S.D.N.Y.).  In that suit, Pfizer seeks indemnification from Stryker for bodily injury resulting from Uni-Knees implanted *after* December 4, 1998.  The Court has previously ruled that the claims of Pfizer in *Pfizer v. Stryker* are not part of this suit.  See The Seventh Case Management Order (Docket #625); July 1, 2005 Opinion (Docket #685).  In this opinion, "Pfizer Claims" refers to Uni-Knees that were implanted before the Howmedica, Inc. asset purchase.

13

*Id.* Stryker contends that this is not an admission that the Pfizer Claims are not part of this lawsuit because, in 2003, Pfizer refused to indemnify them for the costs associated with defective Uni-Knees sold prior to December 4, 1998. *See* Feb. 18, 2004 email, Exhibit B Stryker's Reply Br. Moreover, the February 18, 2004 email also states that Stryker is seeking coverage for three Pfizer Claims. *Id.* XLIA, however, asserts that the Pfizer Claims are not part of this lawsuit citing its letter denying coverage dated October 11, 2001. Exhibit 14, Stryker's Part. Mot. Summ. J. at 2, n. 2. The letter states:

> It is our [XLIA's] understanding that Stryker is not tendering to Winterthur certain claims/lawsuits which involve the Uni-Knee . . . It is our understanding that Pfizer is providing Stryker full defense and indemnity of these matters pursuant to a contractual obligation. Please advise us immediately if we are mistaken.

*Id.* Based on the evidence before the Court, it appears that Stryker notified XLIA of each Pfizer Claim shortly after it was filed and, when they learned that Pfizer would not be indemnifying them for the sixteen Pfizer Claims. *See* Feb. 18, 2004 email, Exhibit B Stryker's Reply Br. Accordingly, provided that Stryker can prove that the Pfizer Claims are part of the defective Uni-Knee products that are the subject matter of this lawsuit, Stryker may seek coverage for the three Pfizer Claims.

In addition, assuming Stryker can demonstrate that the Pfizer Claims are part of the defective Uni-Knees underlying this lawsuit, there is no genuine issue of fact regarding timely notice of the Pfizer Claims. Stryker has provided a chart setting forth the date they were notified of each Pfizer Claim and the date on which XLIA was notified. Attachment B, Aaron Pettit Aff., Exhibit 8, Stryker's Mot. Part. Summ. J. According to the chart, Stryker

notified XLIA of each Pfizer Claim at issue in this case within one month of receiving the claim. *Id.* This Court has previously held that a nine-week delay in providing notice of a claim is not untimely. *Federal Ins. Co. v. X-Rite, Inc.*, 748 F. Supp. 1223, 1230 (W.D. Mich. 1990) (Bell, J.). In this case, the notice provided by Stryker to XLIA was well within this standard of timeliness.

Moreover, in order to succeed on an affirmative defense of untimely notice, XLIA must show that they were actually prejudiced by the late notice. *West Bay Exploration Co. v. AIG Specialty Agencies of Texas, Inc.*, 915 F.2d 1030, 1036 (6th Cir. 1990); *Koski v. Allstate Ins. Co.*, 456 Mich. 439, 444, 572 N.W.2d 636, 639 (1998). The insurer must demonstrate actual prejudice resulting from the insured's delay. *Century Indem. Co. v. Aero-Motive Co.*, 336 F. Supp.2d 739, 755 (W.D. Mich. 2004) (Quist, J.). In determining whether a delay has prejudiced an insurer, the Court may consider whether the delay materially impaired the insurer's ability to investigate liability and damage issues, evaluate, negotiate, defend, or settle a lawsuit, pursue claims against third parties, contest the liability of the insured to a third party, and contest its liability to the insured. *Id.* (quoting *Aetna Cas. & Sur. Co. v. Dow Chemical Co.*, 10 F. Supp.2d 800, 813 (E.D. Mich. 1998) (Edmunds, J.)). XLIA has failed to assert that it was prejudiced in any way by the timing of the notice provided in this case. Accordingly, if Stryker can demonstrate that the Pfizer Claims are part of the defective Uni-Knees at issue in this case, XLIA cannot raise the affirmative defense of lack of timely notice.

4.  XLIA's Affirmative Defense No. 13

XLIA's thirteenth affirmative defense is: "If other valid and collectible insurance applies to any loss that is also covered by the Policy, the Policy is excess of all such other insurance." XLIA's Ans. to Amend. Compl., Affirm. Def. No. 13 (Docket #56). In response to Stryker's second set of interrogatories, XLIA limited this affirmative defense to arguing that Stryker is not entitled to a double recovery of any defense and indemnity payments. Exhibit 3, Stryker's Part. Mot. Summ. J. pg. 56-57.  In the present motion, Stryker acknowledges that they are barred from seeking a double recovery from their insurers and contends that they are entitled to summary judgment on this affirmative defense.

Consideration of this "double recovery" issue appears to be premature.  At present, there has been no determination that XLIA or any other insurer is liable for the defense and settlement costs incurred by Stryker.  In fact, as presently constituted, this matter is proceeding toward a bifurcated trial in which the first trial will consider coverage-related issues and the second phase will consider the reasonableness of settlements and fees.  The prospect of a double recovery is not related to the issue of whether XLIA's policy provides coverage.  Consequently, this issue is not before the Court at this time and it is not necessary to rule on it at present.  In the event the jury determines that Stryker is entitled to coverage under the policy, the issue of double recovery may then be litigated and considered.

5.  Whether the defective Uni-Knees involved in the Underlying Claims constitute a "batch" under the XLIA policy?

16

Stryker also seeks summary judgment on whether there is a "batch," as that term is defined under the policy. Further, they request a ruling on which Uni-Knees are within the batch. The Medical Products Endorsement defines the term "batch" as "all medical products which have the same known or suspected defect or deficiency which is identified by the same advisory memorandum." Ex. 1, Medical Products Endorsement ¶ 3. An "advisory memorandum" is any public communication by an officer of Stryker with a primary purpose of informing recipients of a risk of substantial harm from a medical product. *Id*. at ¶ 4. XLIA has not disputed that there is a "batch" in this case. But they do object to Stryker's definition of the "batch," arguing it is overly broad and attempts to improperly remove the issue of the definition of the defect in the product from the jury.

At the very least, it is clear that there is a "batch" in this case, however, the definition of the defect in that "batch" is for the jury to determine. *See* December 1, 2004 Opinion at 6. XLIA has admitted as much in their denial of coverage letter, discovery responses, and previous filings with this Court. *See* October 11, 2001 Denial Letter, Exhibit 14 at pg. 5, Stryker's Mot. Part. Summ. J.; XLIA's Ans. to Interrogs. Nos. 6, 34, Exhibit 3; XLIA's Br. Mot. Summ. J. on Coverage at 3-4 (Docket #534). For example, in response to Stryker's sixth interrogatory requesting information on which Uni-Knees were part of the "batch," XLIA listed 75 individuals who received Uni-Knees with the same known or suspected defect or deficiency and, therefore were part of the "batch." Exhibit 3, XLIA's Ans. to Interrogs. No. 6 at 30-32. Further, XLIA has maintained throughout this litigation that the July 28, 2000 letter from Ned Lipes, an officer of Stryker and Howmedica Osteonics, is the

"advisory memorandum" that defines the defect or deficiency in the batch of Uni-Knees. *See e.g.* Oct. 11, 2001 Denial Letter at 5, XLIA's Ans. to Interrogs. Nos. 10, 34. Thus, summary judgment can be entered regarding the Uni-Knees in the 75 Underlying Claims.

Stryker also contends that the Pfizer Claims can be included in the batch. The parties have provided the Court with very little information regarding the Pfizer Claims. Stryker has submitted a chart detailing the implant and explant dates of certain Uni-Knees, including the Pfizer Claims. Exhibit 2, Stryker's Mot. Part. Summ. J. Thus, it appears that the Pfizer Claims may be a part of the batch of Uni-Knees with the same known or suspected defect as the 75 Underlying Claims. As stated previously, it will be Stryker's burden at trial to show that the Pfizer Claims involve Uni-Knees that are part of the batch at issue in this case.

6. Who must know or suspect the "defect or deficiency" in the Uni-Knee under the Medical Products Endorsement in order to bar coverage under the XLIA policy?

Under the XLIA policy, "[b]atch coverage shall not apply to any loss, which arises out of a defect, [sic] or deficiency that is known or suspected prior to 1-1-00." Medical Products Endorsement. XLIA has consistently maintained that it is not obligated to provide insurance coverage to Stryker based upon this clause. *See e.g.*, Winterthur Denial Letter October 11, 2001 at 5 ("[I]t appears as though both Stryker and Howmedica Osteonics Corp. had knowledge of the Uni-Knee defect . . . prior to January 1, 2000.") Exhibit B, Stryker's Res. to XLIA's "No Evidence" Mot. Summ. J.; XLIA's Res. to Interrogs. Nos. 1, 2, 19, 28, Exhibit 3 Stryker's Mot. Part. Summ J. The Court has already determined that the knowledge issue must be submitted to the jury. *See* December 1, 2004 Opinion at 9. In order

18

to resolve this issue at trial, however, it is necessary to determine whose knowledge or suspicion is relevant under the policy language.

Stryker contends that the intent of the clause was that coverage was excluded if the defect or deficiency in the product was known or suspected by a Stryker risk manager or officer.  They rely upon the testimony of Danny Dean, a former risk manager for a medical products company and a former insurance broker.  Dean explained that he drafted an endorsement similar to the Medical Products Endorsement at issue in this case for another XLIA (then Winterthur) insurance policy.  Danny Dean Dep. at pg. 20-23, Exhibit 15, Stryker's Mot. Part. Summ. J.  According to Dean, when the issue of whose knowledge was relevant arose between his company and XLIA, "[XLIA] and I discussed [the knowledge issue] and we agreed that it, in fact, had to be the risk manager or the people that managed him and/or were responsible for the entire corporation, not just some person in the field."  *Id*. at 56-57.  Dean also explained that from his experience, if the knowledge of anyone in the corporation was relevant it would lead to many instances in which the insurer could easily avoid coverage.  *Id*. at 70-71.

XLIA responds by noting that, while Stryker sought Dean's advice regarding the Medical Products Endorsement during the policy negotiations, they did not ask him about the "known or suspected" clause.  *Id*. at 61, 110.  Indeed, Dean's testimony regarding the intent of the clause is framed with the caveat, "[i]f the question had been asked at the time, that's how I would have responded."  *Id*. at 61, 68-69.  Further, XLIA contends that Stryker is attempting to rewrite the policy language by including Dean's interpretation of the "known

or suspected" clause.  XLIA argues that this clause is clear and does not require an officer

or risk manager of Stryker to know or suspect a defect in order to exclude coverage.[5]  Rather,

they argue that the imputed-collective-knowledge standard applies and any knowledge of the

defect by a Stryker employee is imputed to the company.  *See Upjohn Co. v. New Hampshire*

*Ins. Co.*, 438 Mich. 197, 214-15, 476 N.W.2d 392 (1991).[6]

As stated previously, when contract terms are plain and unambiguous, the Court must

enforce the contract as written.  *See e.g., Nikkel*, 460 Mich. at 566, 690 N.W.2d 915.  But

when a contract is ambiguous the meaning is a question of fact for the jury.  *Klapp*, 468

Mich. at 469, 663 N.W.2d at  453-54.  An insurance contract is ambiguous if its provisions

---

[5]XLIA also notes that during the negotiation of the Medical Products Endorsement, Stryker specifically requested that the "advisory memorandum" be authored by an officer of Stryker.  XLIA contends that if Stryker wanted to limit the scope of the "known or suspected" clause, they could have requested a similar limitation.

[6]In *Upjohn*, the Michigan Supreme Court adopted the imputed-collective-knowledge standard as set forth in *Copeman Labs Co. v. General Motors Corp.*, 36 F. Supp. 755, 762 (E.D. Mich. 1941):

> "When a person representing a corporation is doing a thing which is in connection with and pertinent to that part of the corporation business which he is employed, or authorized or selected to do, then that which is learned or done . . . is in the knowledge of the corporation.  The knowledge possessed by a corporation about a particular thing is the sum total of all the knowledge which its officers and agents, who are authorized and charged with the doing of the particular thing acquire, while acting under and within the scope of their authority."

*Upjohn Corp.*, 438 Mich. at 214.  This standard "does not require that the employees acquiring knowledge must possess particular corporate authority . . . the employee must acquire the knowledge while acting within the scope of the employment he or she is authorized to perform."  *Kingsley Assoc., Inc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 504 (6th Cir. 1995); *see also Upjohn Corp.*, 438 Mich. at 215 n. 14 (rejecting dissent's view that in order to impute knowledge, employee needed to be a corporate officer).

are capable of interpretations that conflict. *Id.* at 467, 663 N.W.2d at 453; *Fromm*, 264 Mich. App. at 311, 690 N.W.2d at 533-34 (citing *Nikkel*, 460 Mich. at 566, 596 N.W.2d at 919).

In this case, the "known or suspected" clause is ambiguous, thus the meaning of the clause is a question of fact for the jury. *Klapp*, 468 Mich. at 469, 663 N.W.2d at 454 (quoting *O'Connor v. March Automatic Irrigation Co.*, 242 Mich. 204, 210; 242 N.W. 784, 787 (1928)). The clause is the final sentence in paragraph 3 of the Medical Products Endorsement. This paragraph addresses the definition of a "batch" for purposes of determining limits of insurance and the self-insured retention amounts. The paragraph ends, however, by excluding batch coverage for "any loss, which arises out of a defect, [sic] or deficiency that is known or suspected prior to 1-1-00." The ambiguity of this clause is readily apparent after a single review. The sentence is vague, written in passive voice, and does not identify whose knowledge or suspicion is relevant. Moreover, there is no indication in the Medical Products Endorsement or the main body of the policy whose knowledge is relevant. Granted, the policy could be read in accordance with XLIA's interpretation, but because the clause is written in passive voice, it does not "fairly admit of but one interpretation." *Raska v. Farm Bureau Mut. Ins. Co. of Michigan*, 412 Mich. 355, 362, 314 N.W.2d 440, 441 (1982).[7] Due to the ambiguity in the clause, the jury must determine the issue of whose knowledge or suspicion is relevant under the policy language. *Klapp*, 468 Mich. at 469, 663

---

[7]Moreover, the "known and suspected" clause is an exclusionary clause which is strictly construed in favor of the insured. *Century Surety Co. v. Charron*, 230 Mich. App. 79, 83; 583 N.W.2d 486 (1998).

N.W.2d at 454.[8]  Accordingly, Stryker's motion for summary judgment on this issue is denied.

IV.

The ambiguity in the Medical Products Endorsement and the coverage provision of the policy render summary judgment in favor of XLIA improper.  This ambiguity also precludes summary judgment in favor of Stryker on its prima facie case of coverage.  Summary judgment can be entered on XLIA's affirmative defenses nos. 1-6, 10-12, and 15-18.  Provided that Stryker can demonstrate that the Pfizer Claims are part of the "batch" in this case, XLIA's affirmative defense no. 9 is precluded.  Stryker is also entitled to summary judgment on the issue of whether a "batch" exists in this case to the extent of the 75 Underlying Claims.  Finally, Stryker's motion for summary judgment on whose knowledge is relevant under the policy is denied because the clause is ambiguous.  An order will be entered consistent with this opinion.


Date:     August 17, 2005                    /s/ Robert Holmes Bell
                                             ROBERT HOLMES BELL
                                             CHIEF UNITED STATES DISTRICT JUDGE

---

[8]Under Michigan law, the goal of contract interpretation is to enforce the parties' intent at the time they entered the contract.  *See e.g.*, *Burkhardt v. Bailey*, 260 Mich. App. 636, 656, 680 N.W.2d 453, 464 (2004).  In order to accomplish this task, the jury may consider relevant extrinsic evidence in resolving the interpretation of the "known or suspected" clause.  *Klapp*, 468 Mich. at 469, 663 N.W.2d at 454.

## APPENDIX TO OPINION

The Court has issued three previous opinions in this case.  The following sets forth the issues of fact identified by the Court that should be addressed at trial.

I.      December 1, 2004 Opinion

a.      What is the definition of the defect in the Uni-Knees at issue in this case?

b.      Whether Stryker or Howmedica Osteonics knew or suspected the defect or deficiency in the Uni-Knees prior to January 1, 2000?

II.      August 27, 2005 Opinion

a.      The meaning of the Medical Products Endorsement and coverage provision.

b.      Whether Stryker can establish that it is entitled to coverage under the XLIA policy?

c.      Whether the Pfizer Claims are part of the defective Uni-Knee products at issue in this case, and thus, part of the "batch" as defined in the XLIA policy?

d.      The meaning of the "known/suspected" clause of the Medical Products Endorsement.