UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


STRYKER CORPORATION and
HOWMEDICA OSTEONICS CORP.,

        Plaintiffs,

                                  File No.  4:01-CV-157

v.

                                    HON. ROBERT HOLMES BELL

XL INSURANCE AMERICA, INC.,
formerly known as WINTERTHUR
INTERNATIONAL AMERICA
INSURANCE COMPANY,

        Defendant.

_____/

## **O P I N I O N**

This matter is before the Court on Plaintiffs Stryker Corporation and Howmedica

Osteonics Corporation's and Defendant XL Insurance America, Inc.'s objections to two

Report and Recommendations issued by the Magistrate Judge on September 26, 2005 and

October 14, 2005.  On the eve of trial of this matter, the Court adjourned trial without date

and directed the parties to confer with the Magistrate Judge to delineate the relevant issues

for trial.  After multiple conferences with the parties, the Magistrate Judge issued the R&R's,

recommending that, in order to simplify the issues presented to the jury, the Court revisit

certain issues previously addressed in the Court's summary judgment opinions and proposing

a special verdict form and eight special jury instructions.

Both parties have filed objections to each R&R.  The Court is required to make a *de novo* review upon the record of those portions of the R&R to which specific objections have been made.  28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).  *See also Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995).  For the reasons that follow, the objections to each R&R are overruled and the Court approves and adopts each R&R as the opinion of the Court.

## I.

A.    The September 26, 2005 Report & Recommendation

The Court will first address the parties' objections to the September 26, 2005 R&R. Defendant objects to the Magistrate Judge's recommendation that the jury be presented with the following question: "Did the parties intend that the Insurance Policy would cover all claims and lawsuits involving products in a single **batch**, no matter when **bodily injury** took place?"  Proposed Special Verdict Form Ques. #1, Oct. 14, 2005 Report and Recommendation (Docket #777). This question encompasses Plaintiffs' interpretation of the insurance policy and Medical Products Endorsement.  The next question on the verdict form presents Defendant's interpretation of the policy, that the Medical Products Endorsement does not relieve Plaintiffs of the obligation to show that each claimant suffered bodily injury from a defective Uni-Knee during the policy period.  *See* Proposed Special Verdict Form Ques. #2.

The Court agrees with the Magistrate Judge that the jury must be presented with special questions embodying the conflicting interpretations of the policy and Medical

Products Endorsement.  Questions #1 and #2 of the Special Verdict Form accurately and clearly provide the jury with each party's interpretation of the policy and Medical Products Endorsement.  This approach is consistent with the Court's previous opinion holding that the meaning of the Medical Products Endorsement and the coverage provision of the policy are ambiguous, and therefore a question of fact for the jury.  Aug. 17, 2005 Opinion at 11-12 (citing *Fromm v. Meemic Ins. Co.*, 264 Mich. App. 302, 311, 690 N.W.2d 528, 533 (2004)) (Docket #689).  Defendant reads the Court's opinion far too narrowly in arguing that the ambiguity in the policy and Medical Products Endorsement is limited to the "interplay between" the endorsement and the coverage provision.  Def.'s Obj. to R&R at 2.  In the previous opinion, the Court held that the policy is "susceptible to *multiple* conflicting interpretations," and then proceeded to cite "two examples of the conflicts and ambiguity inherent in the policy and Medical Products Endorsement," involving the first and third paragraphs of the Medical Products Endorsement.  Aug. 17, 2005 Op. at 10, 11-12 (emphasis added).  The examples cited did not fully encompass the ambiguity presented in the coverage provision and Medical Products Endorsement.  Further, the Court denied summary judgment on the issue of coverage to both Plaintiffs and Defendant based upon the ambiguous meaning of the coverage provision and Medical Products Endorsement.  *Id*. at 11-12.  In other words, the Court could not determine, as a matter of law, whether Plaintiffs' or Defendant's interpretation of the policy was correct.

Because the meaning of the coverage provision and Medical Products Endorsement is ambiguous, Michigan law requires that the interpretation of the contract is a question of fact to be decided by the jury. *See e.g.*, *Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 469, 663 N.W.2d 447, 453-54 (2003). In order to resolve this dispute, it is necessary for the jury to be presented with each parties' interpretation of the relevant contractual provisions. Questions #1 and #2 accomplish this task. Accordingly, Defendant's objection to Question #1 of the Special Verdict Form is overruled.

Plaintiffs have also objected to Questions #1 and #2 of the Special Verdict Form contending that Defendant's refusal to defend Plaintiffs in the underlying claims renders the issue of whether bodily injury occurred during the policy period moot. This argument is premised upon Defendant's duty to defend Plaintiffs set forth in the policy. This argument apparently was never raised in front of the Magistrate Judge and makes its first appearance in Plaintiffs' objections to the R&R. A party cannot raise an issue for the first time in its objection to an R&R. *O'Neil v. Appel*, 165 F.R.D. 479, 482 (W.D. Mich. 1996) (Bell, J.) ("Pursuant to the exhaustion doctrine that is applied with regularity to issues raised on appeal, the court need not review this argument as it was not raised before the magistrate judge."). *See also Greenhow v. Sec'y of Health & Human Servs.*, 863 F.2d 633, 638-39 (9th Cir. 1988) (holding that the Magistrates Act was not intended "to give litigants an opportunity to run one version of their case past the magistrate, then another past the district court."); *rev'd on other grounds United States v. Hardesty*, 977 F.2d 1347 (9th Cir. 1992); *Jesselson v. Outlet Assocs.*

*of Williamsburg, Ltd. P'ship*, 784 F. Supp. 1223, 1228 (E.D. Va. 1991) ("A magistrate's decision should not be disturbed on the basis of arguments not presented to him."). For this reason alone, Plaintiffs' objection to Questions #1 and #2 is overruled.

Even if the Court considered the merits of Plaintiffs' objection it would be overruled. Previously, this Court denied Plaintiffs' motion for summary judgment on Defendant's duty to defend. *See* Aug. 27, 2004 Op. at 13 (Docket #603). The Court held that because Plaintiffs agreed to "self-insure," they were required to establish that the claims and lawsuits it settled or defended were within Defendant's policy coverage. The Court also found that genuine issues of material fact as to whether Plaintiffs' claims were within Defendant's coverage precluded summary judgment on the issue of the duty to defend. Plaintiffs' overlook the Court's previous denial of summary judgment in making the argument that Defendant's duty to defend renders the issue of the meaning and proper interpretation of the coverage provision and Medical Products Endorsement moot. Moreover, Plaintiffs appear to be under the impression that Defendant's refusal to defend resulted in a situation in which Plaintiffs were no longer required to establish the elements of coverage. This is erroneous. Defendant's refusal to defend cannot create coverage where none exists. And as stated in the Court's previous opinion, Plaintiffs have the burden of proving that the claims and lawsuits it settled or defended are subject to Defendant's coverage obligation.

As Plaintiffs note, an insurer has two alternatives when it decides there is no coverage: repudiate liability and refuse to defend, thus taking the risk that its no coverage determination

5

was wrong; or the insurer may protect itself by providing a defense under a reservation of rights. *Century Indem. Co. v. Aero-Motive Co.*, 336 F. Supp. 2d 739, 745 (W.D. Mich. 2004) (Quist, J.). An insurer, however, may always avoid liability by demonstrating there is no coverage under the policy. *Id.* That is the position that the litigants find themselves in this case. Defendant refused to defend, believing there was no coverage under the policy. The first stage of the trial will determine if Defendant's determination of no coverage was correct. The jury will determine if the underlying claims and lawsuits are within the coverage obligation set forth in Defendant's policy. In order to make this determination, the jury must first determine the meaning of the policy. That is, the jury must determine what the parties intended would be required for Defendant's coverage obligation to be triggered. Without making this initial determination, there could be no assessment of whether Defendant breached its duty to defend.

Thus, in the unique context of this case, the duty to defend is coextensive with the coverage determination in that it rises or falls upon the determination of whether coverage applies in this case. In order to determine the parties' intentions, the jury must be asked whether the parties intended that coverage would apply to all claims and lawsuits involving products in a single batch, regardless of when bodily injury took place (Plaintiffs' interpretation represented in Question #1), or that Plaintiffs' are required to show that each individual claim suffered some bodily injury during the policy period (Defendant's position

6

represented in Question #2).  Therefore, Questions #1 and #2 are highly relevant to this case and must be presented to the jury.  Consequently, Plaintiffs' objection is overruled.

Defendant next objects to the Magistrate Judge's recommendation that the Court grant Plaintiffs summary judgment on the issue of whether an occurrence existed regarding the Uni-Knee batch at issue in this case.  Defendant also objects to the Magistrate Judge's failure to include a question addressing whether bodily injury was caused by an occurrence.  In the Court's August 17, 2005 Opinion, it held that the first paragraph of the Medical Products Endorsement was ambiguous and therefore neither party was entitled to summary judgment.  Aug. 17, 2005 Op. at 11-12.  Further, the Court also indicated that the issue of whether an "explant" was necessary for the existence of an occurrence was a question of fact for the jury.  *Id*.  In light of further development of the issues by the parties, the Court has a better understanding of the issues and agrees with the Magistrate Judge that the existence of an occurrence is a question of law and that the Medical Products Endorsement is not ambiguous with regard to the batch coverage presented in this case.  As such, summary judgment on the issue of an occurrence is granted in Plaintiffs' favor.

Defendant contends that the Magistrate Judge erred in reasoning that Defendant's repeated admission that the claims and lawsuits involving the Uni-Knees at issue in this case constituted a batch resulted in a concession that there was an occurrence.  The Court agrees with the Magistrate Judge's analysis that Defendant cannot admit that a batch exists, yet also contest the existence of an occurrence.  Defendant argues that the Magistrate Judge's analysis

7

confuses the batch, which, in Defendant's view, consists only of the medical products, with the claims and lawsuits arising from the products. The Court fails to see the relevant distinction between "products" and "claims and lawsuits." It appears to be nothing more than a distinction without a difference.[1]

The claims and lawsuits are inextricably intertwined with the defective medical products. If there was no defective product, there would be no claim or lawsuit. Defendant's coverage obligation is only implicated if claims and lawsuits arising from the defective product are asserted against Plaintiffs. Moreover, the language of the Medical Products Endorsement does not make the fine distinction between products and claims now asserted by Defendant. In the third paragraph, the Medical Products Endorsement states, "[t]he date of the advisory memorandum will be considered the date of occurrence for *all claims* resulting from or relating to the batch." Medical Prods. End. ¶ 3 (emphasis added). Further, in the denial of coverage letter, when asserting its position that if Plaintiffs knew or suspected the defect in the Uni-Knee prior to January 1, 2000, Defendant explained, "there

---

[1]The Court also notes that Defendant's argument is internally inconsistent. On the one hand, Defendant acknowledges that the issue of whether there is an occurrence under the policy is a question of law for the Court. *See* Def.'s Obj. to R&R at 5 ("XLIA agrees that the determination of an "occurrence" is a matter of law."). But ultimately, Defendant concludes that this issue is a question of fact for the jury. Def.'s Obj. to R&R at 7. ("The jury thus must be asked what constitutes an occurrence and whether that event has been experienced by each individual claimant.") (emphasis in original). Defendant cannot have it both ways. The Court agrees with the Magistrate Judge (and the parties) that whether there is an occurrence is a question of law and further agrees with the Magistrate Judge's analysis evaluating whether there is an occurrence in this case.

will be *no batch coverage* for the *Uni-Knee claims and lawsuits* under the Policies." Denial Letter, Def.'s Mot. Summ. J., Vol. F., Ex. 2 (Docket #533) (emphasis added). Therefore, the Court overrules Defendant's objection to the Magistrate Judge's recommendation. The Magistrate Judge properly analyzed the issue of whether, as a matter of law, there is an occurrence in this case and the Court approves and adopts the Magistrate Judge's recommendation.

Plaintiffs next object to the Magistrate Judge's definition of the Uni-Knee's defect. The Magistrate Judge recommended that the Court revisit its previous decision holding that the definition of the defect was a question of fact for the jury. *See* Dec. 1, 2004 Opinion at 6 (Docket #619). The Magistrate Judge recommended that this issue be resolved by the Court as a matter of law and also recommended that the defect be defined as the "Uni-Knees were available in inventory for implantation by physicians after the expiration of their shelf life." Sept. 26, 2006 R&R at 10. Upon review of the R&R and the record in this case, the Court agrees with the Magistrate Judge's thorough analysis of the definition of the defect issue and withdraws its previous ruling holding that the definition of the defect is a question of fact for the jury.

Plaintiff argues that the defect in the Uni-Knee was the *implantation* of the device after its intended shelf life. Plaintiff also asserts that the Magistrate Judge's analysis failed to consider the language of the Medical Products Endorsement and the July 28, 2000 advisory memorandum. The Court does not agree. Contrary to Plaintiffs' assertions, the

definition of the defect set forth in the Magistrate Judge's R&R is entirely consistent with both the Medical Products Endorsement and the advisory memorandum. The only plausible definition of the defect revealed in the advisory memorandum is that the Uni-Knees were available for implantation beyond their intended shelf life. Plaintiffs' reliance on implantation as the defect confuses the use that the device is put to with the defect itself. Implantation is simply that, an action that the device is put to. It is not the defect itself. To be sure, as Plaintiffs' note, the advisory memorandum mentions that the defective devices were implanted beyond their shelf life. The reference to implantation in the advisory memorandum simply refers to the action or event that revealed the defective nature of the product.

The critical language of the advisory memorandum, which both parties agree is the relevant document for defining the defect, is the explanation that the Uni-Knees are "susceptible to oxidation and the potential for increased wear if they resided on the shelf for an extended period of time prior to implantation." Advisory Memo, Vol. A, Ex. 3 (Docket #533). This is the defect in the Uni-Knees. After expiration of the shelf life, Uni-Knees that were available for implantation were defective because they were susceptible to oxidation and increased wear when put to their foreseeable use. The implantation simply reveals the defect, it is not the defect itself.

Plaintiffs' reliance on language from the Medical Products Endorsement in support of its position is similarly misplaced and does not support its claim that implantation is the

10

defect. Plaintiffs point to a portion of the definition of "advisory memorandum" indicating that the purpose of the communication must be to inform recipients "of a risk of substantial harm from the medical product in commercial use." Medical Prods. End. ¶ 4. Plaintiff emphasizes the term "commercial use" to argue that a product is not in commercial use until it is sold. Plaintiffs also point to the clause of the endorsement excluding batch coverage for "any loss, which arises out of a defect, or deficiency that is known or suspected" prior to January 1, 2000. Medical Prods. End. ¶ 3. Based upon these portions of the endorsement, Plaintiffs suggest that the Uni-Knee is only defective upon sale and implantation.

Plaintiffs' argument is completely misguided. First, Plaintiffs construe "commercial use" too narrowly. "Commercial use" is a defined term in the Medical Products Endorsement. The term is defined by exclusion: "'Commercial use' does not mean devices that (1) are being used in clinical investigations and (2) are not generally available for sale." Medical Prods. End. ¶ 4. By excluding those devices that are used in clinical investigations and not generally available for sale, "commercial use" clearly includes those devices which are *not* being used in clinical investigations and *are generally available for sale*. Therefore, "commercial use" is clearly not limited to products that were already sold. Consequently, Plaintiffs' contention that commercial use, and thereby the defect in the Uni-Knee, is limited to products already sold is incorrect. There is no requirement that the device is only defective upon sale or implantation.

Second, Plaintiffs' reliance on the language in the exclusion is misplaced because it equates the need for coverage with the defect in the product. Whether there is a loss that necessitates coverage under the policy is a completely different issue from whether there is a defect in the product. While coverage may not be necessary until a loss caused by a defect occurs, this does not mean, as Plaintiffs suggest, that there is no defect until there is a loss or injury. Simply put, a product may be defective without any loss or injury resulting from that defect, and thus any need for coverage. Accordingly, Plaintiffs' objection to the R&R is unavailing and the Court finds that the Magistrate Judge properly concluded that the defect in the Uni-Knee did not include implantation and was limited to the availability in inventory of the product beyond the expiration of their shelf life.[2]

Defendant briefly objects to the Magistrate Judge's definition of the defect. While Defendant agrees with the Magistrate Judge that the definition of the defect does not include implantation and agrees with the definition of the defect contained in the September 26, 2005 R&R, it objects to the inclusion of the phrase, "held in inventory for sale" in the definition set forth in the third Special Jury Instruction attached to the October 14, 2005 R&R. Defendant also requests that the means by which the Uni-Knee was packaged and sterilized

_____

[2]Plaintiffs also contend that the definition of the defect should refer to the defect in the *batch* of Uni-Knees. The special jury instructions already inform the jurors that "[a]ll 79 Uni-Knees discussed during this trial had the same defect or deficiency and therefore are included in a single batch." This more than adequately informs the jury that the Uni-Knees suffered from a common defect and were part of the batch. Thus, Plaintiffs' objection is overruled.

(standard atmospheric conditions and sterilized by gamma radiation) be included in the definition of the defect. The Court sees no need to inform the jury of the method by which the Uni-Knees were packaged and sterilized and it fails to see the relevance of the slight difference between the definition of the defect contained in the September 26, 2005 R&R and the special jury instruction. Nevertheless, the Court will make a slight modification to the special jury instruction so that it conforms with the definition contained in the September 26, 2005 R&R. The instruction will read: "The court has determined, for purposes of this case, the Duracon Uni-Knees were defective if they were available in inventory for implantation by physicians beyond their shelf life, that is, beyond five years." Notwithstanding this slight modification, the Court concludes that the Magistrate Judge properly analyzed this issue. Accordingly, the September 26, 2005 R&R is approved and adopted as the opinion of the Court.

B.    The October 14, 2005 Report and Recommendation

In the October 14, 2005 R&R, the Magistrate Judge addressed the proposed instructions submitted by the parties, ultimately recommending eight special jury instructions to accompany the four-question special verdict form. Both parties have filed objections to the Magistrate Judge's recommended instructions. The objections are addressed below.

Defendant first objects to Special Jury Instruction No. 1. This instruction provides a brief overview of the case as well as a short summary of the nature of an insurance contract. Defendant specifically objects to the second and third sentences of the second paragraph:

13

> The Insurance Policy in this case requires the Insurance Company, in certain circumstances, to cover certain lawsuits and claims brought by third parties who allege that they suffered bodily injury because of defects in the Insured's medical products.  Insurance policies such as the one involved in this case cover losses caused by accidents, even if the accident is caused by the negligence or fault of the insured party.

Special Instruction No. 1, Oct. 14, 2005 R&R, Attach. #1 (Docket #777).  Defendant objects to the reference that it is "required" to provide coverage, arguing that the instruction should also refer to possible exclusionary language that may apply.  Further, Defendant contends that the instruction is confusing because it fails to identify the "certain circumstances" that must exist for coverage to apply.  Defendant's objection is misguided and is overruled.  The first sentence of the quoted passage above provides an accurate, albeit general, summary of Defendant's coverage obligations.  Defendant's objection that the instruction fails to refer to certain exclusions that may be applicable overlooks the fact that in the following paragraph the jury is informed that Defendant "affirmatively asserts that these lawsuits and claims were expressly excluded from coverage."  Moreover, the objection also fails to account for the sixth special jury instruction which informs the jury that Defendant is relying on a specific exclusion contained in the Medical Products Endorsement.  Further, the failure to identify the "certain circumstances" that must exist for coverage to apply is adequately remedied by the other seven special jury instructions explaining the requirements for coverage under the policy.

Defendant also objects to the final sentence of the quoted passage above.  Defendant contends that the reference to "accidents" is surplusage and is not applicable to this case.  The

14

Court does not agree.  This sentence simply informs the jury that, in general, insurance policies are purchased to cover an insured's accidents, or unintentional actions, that result from their own negligence or fault.  The other special instructions describe, in detail, the requirements and limits of the specific policy at issue.  The reference to "accidents" in Special Instruction No. 1 is, at best, harmless.

Defendant next objects to the final sentence in the second special instruction. In Special Instruction No. 2, the Magistrate Judge set forth a number of legal principles that the jury must apply in order to determine the meaning of the ambiguous insurance policy at issue in this case.  Defendant objects to the following sentence: "If there is a conflict between an endorsement and the main body of the Insurance Policy, the endorsement controls."  While Defendant acknowledges that this is a correct statement of law, it objects because, in it's view, this principle is a rule of construction that will not aid the jury in making a factual determination.

Defendant's objection is meritless and ignores the Court's previous ruling that the meaning of the Medical Products Endorsement and the coverage provision is a question of fact for the jury.  As such, the jury must apply the rules of contract construction set forth in Special Instruction No. 2, including the rule that where an endorsement conflicts with the main body of a policy, the endorsement controls.[3]  *See McKusick v. Travelers Indem. Co.*,

_____

[3]The Court also notes that application of this principle is entirely consistent with the language of the policy and endorsements at issue in this case.  Each endorsement attached to Defendant's policy includes the unambiguous cautionary language, "[t]*his endorsement*

15

246 Mich. App. 329, 332-33, 632 N.W.2d 525 (2001) ("[C]onflicts between the terms of an endorsement and the form provision of an insurance contract are resolved in favor of the terms of the endorsement."). Defendant's reliance on *Auto Owners Ins. Co. v. Jensen*, 667 F.2d 714 (8th Cir. 1981), in support of its objection is completely misplaced. *Jensen* involved the interpretation of an insurance contract pursuant to Minnesota law, which requires that the interpretation of an insurance contract, even if ambiguous, is a matter of law for the court. 667 F.2d at 721. Michigan law is directly contrary. *See e.g.*, *Klapp*, 468 Mich. 459, 469, 663 N.W.2d 447, 453-54 ("It is well settled that the meaning of an ambiguous contract is a question of fact that must be decided by the jury."). Accordingly, Defendant's objection to special instruction No. 2 is overruled.

Defendant next objects to Special Instruction No. 7. This instruction addresses the "known or suspected" exclusion contained in the Medical Products Endorsement. In light of the Court's previous holding that this exclusion was ambiguous, the jury must determine the parties' intent with regard to this clause. Special Instruction No. 7 provides the jury with guidance on how to determine the parties' intent. Defendant objects to the final sentence in the first paragraph, which states: "If, after considering all these things, you are still unsure about the meaning of the exclusion, Michigan law says that the exclusion must be construed against the insurance company and in favor of coverage." Special Ins. No. 7. This is an

---

*changes the policy. Please read it carefully*." *See e.g.*, Medical Prods. End. (emphasis in original). Therefore, consistent with this language, terms of an endorsement control over the main body of the policy.

accurate statement of Michigan law. *See Century Surety Co. v. Charron*, 230 Mich. App. 79, 83, 583 N.W.2d 486 (1998).  Defendant contends that this instruction is a version of the rule of *contra proferentum* that Plaintiffs requested and the Magistrate Judge rejected.  *See* Oct. 14, 2005 R&R at 6-9.  Although closely related to the rule of *contra proferentum*, the portion of Special Instruction No. 7 quoted above, is a separate and distinct legal principle.  The rule of *contra proferentum* applies where contractual language is ambiguous and requires that the ambiguities be construed against the drafter.  *Klapp*, 468 Mich. at 470-71, 663 N.W.2d at 454-55.  In contrast, the rule that exclusions are construed in favor of coverage is not dependent on a finding that the insurance company is the drafter of the policy and is not generally applicable to all ambiguities in an insurance policy, but rather is limited to exclusions.  This Court agrees with the Magistrate Judge that this narrow rule of interpretation applies in this case and is consistent with Defendant's burden of proving the application of an exclusion from coverage.

Although the Court agrees with the Magistrate Judge's inclusion of this instruction, the Court will make a few minor alterations to the language.  The final sentence of the first paragraph of Special Instruction No. 7 will be as follows: "If, after considering all these things, you are still unsure about the meaning of the exclusion, Michigan law says that the exclusion must be *strictly* construed in favor of insurance coverage."  (emphasis added to indicate alteration).  This language hews more closely to Michigan law on the subject.  *See Century Sur. Co.*, 230 Mich. App. at 83, 583 N.W.2d at 488.

Finally, Defendant objects to the Magistrate Judge's rejection of a proposed instruction that would inform the jury that knowledge of the officers, agents, or employees of a wholly-owned corporate subsidiary is imputed to the parent corporation.  Defendant contends that this instruction is consistent with the imputed-collective-knowledge standard adopted in Michigan.

The Magistrate Judge properly analyzed this issue and properly rejected Defendant's proposed instruction.  While Defendant cites the seminal case in Michigan on the imputed-collective-knowledge standard, *Upjohn Co. v. New Hampshire Ins. Co.*, 488 Mich. 197, 476 N.W.2d 392 (1991), it extends the standard well beyond the boundaries established in the Michigan Supreme Court's opinion.  Namely, Defendant improperly stretches the holding in *Upjohn* to include imputation of knowledge of an employee of a subsidiary to the parent corporation.  In making this assertion, Defendant fails to point to any portion of the decision in which the court made such a far reaching holding.  The only discussion of the imputed collective knowledge standard in *Upjohn* is the court's adoption of the standard set forth in *Copeman Labs Co. v. General Motors Corp.*, 36 F. Supp. 755, 762 (E.D. Mich. 1941):

> When a person representing a corporation is doing a thing which is in connection with and pertinent to that part of the corporation business which he is employed, or authorized or selected to do, then that which is learned or done by that person, pursuant thereto is in the knowledge of the corporation.  The knowledge possessed by a corporation about a particular thing is the sum total of all the knowledge which its officers and agents, who are authorized and charged with the doing of the particular thing acquire, while acting under and within the scope of their authority.

*Upjohn*, 438 Mich. at 214, 476 N.W.2d at 401.  There is absolutely no indication that this standard obliterates the distinction between a parent and subsidiary and results in the imputation of the knowledge of a subsidiary's employee to a parent corporation.

Absent citation to a specific portion of the *Upjohn* decision in which the court extended the imputed knowledge standard to include employees of a subsidiary, Defendant relies on the court's identification of the various entities involved in the case and a recitation of some of the underlying facts of the case.  Defendant argues that while the state supreme court's identification of the corporate entities involved in the case was "imprecise," the court made it clear that the employee whose knowledge was imputed to the parent corporation was not an employee of the parent.  Therefore, in Defendant's view, the court held that knowledge of an employee of a subsidiary can be imputed to a parent.

Defendant misreads the *Upjohn* opinion.  First, the court clearly distinguished between the various corporate entities involved in the case, describing the plaintiff as, "the Upjohn Company" or "Upjohn," and referring to Upjohn's Puerto Rico-based division as "the Upjohn Manufacturing Company," or "UMC."  Contrary to Defendant's assertion, these designations were not used indiscriminately but were used precisely when referring to either the division or the plaintiff.  *See e.g.*, *Upjohn*, 438 Mich. at 202, 204, 476 N.W.2d at 394, 396 (describing actions taken by an "Upjohn employee," documents stored at the "UMC facility," and explaining "Upjohn filed suit against defendant").  Second, the court clearly indicated that the employee whose knowledge was imputed to plaintiff was an "Upjohn employee."  *Id*. at

19

202, 210, 214, 476 N.W.2d at 394, 399, 401.  Given the court's precise delineation between

UMC and Upjohn, if the employee had been employed by Upjohn's division, the court would

have referred to a "UMC employee."[4]

Furthermore, it is difficult to accept Defendant's argument that the Michigan Supreme

Court jettisoned the long-standing principle that a parent and subsidiary are treated as

separate and distinct entities absent some abuse of the corporate form, *see, e.g., Acton

Plumbing & Heating Co. v. Jared Builders, Inc.*, 368 Mich. 626, 629, 118 N.W.2d 956, 958

(1962), through the device of imprecise reference to the various entities and without so much

as a mention in the court's analysis in *Upjohn*.  It seems highly unlikely that the court would

do away with the distinction between a parent and subsidiary *sub silencio*.  The better view,

and the only view that is clearly expressed in *Upjohn*, is that knowledge about a particular

subject obtained by a corporation's employee charged with responsibility for that subject is

imputed to the corporation.  This standard, however, does not extend to imputing knowledge

of a subsidiary's employee to the parent corporation.  Accordingly, Defendant's objection is

overruled.[5]

---

[4]Defendant also points to historical corporate records purporting to show that UMC was a subsidiary of Upjohn at the time of the dispute addressed in the Michigan Supreme Court's *Upjohn* opinion.  There is no indication, however, that these records were relied upon by the Michigan Supreme Court (or that they were even included in the record before the court) in reaching its decision in *Upjohn*, and they cannot be used to expand the court's holding.

[5]Defendant also relies on *Standard Savings & Loan Ass'n v. Aldrich*, 163 F. 216 (6th Cir. 1908), and *Baldassari v. Produce Terminal Realty Corp.*, 282 N.E.2d 649 (Mass. 1972), to support its position.  Neither of these cases is applicable to the issues addressed in this case

The Court now turns to Plaintiffs' objections to the October 14, 2005 R&R. Plaintiffs' first object to the Magistrate Judge's rejection of their proposed *contra proferentum* instruction. As mentioned previously, the rule of *contra proferentum* provides that where a contract is ambiguous, and a jury is unable to determine the parties' intentions through relevant extrinsic evidence, the ambiguities are construed against the drafter of the contract. *See Klapp*, 468 Mich. at 471, 663 N.W.2d at 455. The Magistrate Judge determined that a *contra proferentum* instruction was not appropriate in this case because the policy and accompanying endorsements were the subject of negotiation between the parties.

The Magistrate Judge properly analyzed this issue. Plaintiffs' argue that the Magistrate Judge erred by not concluding that Defendant was the drafter of the policy and accompanying endorsements as a matter of law. Plaintiffs also assert that the Magistrate Judge made improper factual findings by concluding that the policy and endorsements were negotiated and that Daniel Dean substantially provided the language of the Medical Products Endorsement.

First, according to Plaintiffs, Michigan law mandates that, in the insurance context, the insurance company is considered the drafter of the policy as a matter of law. In support of this position, Plaintiffs rely on *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 664 N.W.2d 776 (2003). In *Wilkie*, the Michigan Supreme Court rejected the "rule of reasonable expectations," a rule of construction under which courts construed an insurance policy in a

---

and do not offer any support to Defendant's position.

manner consistent with the parties' reasonable expectations.  469 Mich. at 51, 664 N.W.2d

at 782.  In the course of discussing the "rule of reasonable expectations" the court mentioned

that the rule was a "surrogate for the rule of construing against the drafter" and was "nothing

more than a unique title given to traditional contract principles applied to insurance contracts

. . . ."  *Id.* at 61, 664 N.W.2d at 786-87 (quoting *Singer v. American States Ins.*, 245 Mich.

App. 370, 381 n. 8, 631 N.W.2d 34, 40 (2001)).  The court also briefly mentioned that, in the

insurance context, the drafter is always the insurer.  *Id.*  Plaintiffs rely on this last statement

from *Wilkie* to support their position in this case.  This statement, however, was plainly dicta

and does not support the conclusion that the Michigan Supreme Court, as a matter of law,

always considers the drafter of an insurance policy to be the insurer.  While the Michigan

Supreme Court plainly recognizes the general rule that ambiguity in a contract is construed

against the drafter, *see State Farm Mut. Auto. Ins. Co. v. Enterprise Leasing Co.*, 452 Mich.

25, 38-39, 549 N.W.2d 345, 351 (1996) (holding that where an insurance contract is

ambiguous, it "should be construed against its drafter and in favor of coverage.") (quoting

*Raska v. Farm Bureau Ins. Co.*, 412 Mich. 355, 362, 314 N.W.2d 440, 441 (1982)), it has

never explicitly held that this rule is strictly applied in the insurance context with the outcome

being that the insurance company is always the drafter.

Such a rigid application of the rule is antithetical to the recent trend in Michigan law,

thoroughly discussed in the R&R, holding that insurance policies are subject to the same

general rules of interpretation that apply to all other contracts.  *See e.g.*, *Rory v. Continental*

22

*Ins. Co.*, 473 Mich. 457, 461, 703 N.W.2d 23, 26 (2005) ("[I]nsurance policies are subject to the same contract construction principles that apply to any other species of contract."). An automatic and rigid conclusion that the insurance company is always the drafter of an insurance contract is directly contrary to the Michigan Supreme Court's clear rejection of specialized rules of construction applicable only in the insurance context.

Second, Plaintiffs' assertion that the Magistrate Judge made improper factual findings does not support rejection of the R&R.  Plaintiffs take issue with the Magistrate Judge's determination that the language of the Medical Products Endorsement was "substantially provided by" Daniel Dean, a broker employed by Marsh & McClennan, Plaintiffs' broker during their negotiation with Defendant.  Oct. 14, 2005 R&R at 8.  Plaintiffs argue that Defendant, not Dean, provided the language of the Medical Products Endorsement.  Based upon this Court's review of the record, it appears that while it is undisputed that Dean authored language that was nearly identical to the Medical Products Endorsement in this case and that this endorsement had been routinely used over the years by insurance companies, including Defendant; in this case Defendant, not Dean, provided the language of the Medical Products Endorsement.  This minor factual discrepancy does not preclude the Court from ultimately agreeing with the Magistrate Judge's recommendation, however, because it is clear that the Magistrate Judge correctly determined that the policy and endorsements were the product of negotiation.  And, the Court agrees with the Magistrate Judge that the rule of

*contra proferentum* has no application where the contract at issue resulted from the parties' negotiations.

Plaintiffs do not dispute that the policy, in its entirety, was the subject of negotiation. Rather, they contend that certain ambiguous portions of the Medical Products Endorsement were not specifically negotiated. Plaintiffs, however, fail to cite any portion of the voluminous record in this case to support its assertion that Defendant refused to amend the Medical Products Endorsement and unilaterally imposed it on Plaintiffs. In fact, the record indicates that the parties discussed and negotiated the policy, and in particular the Medical Products Endorsement. According to Brad Kuchinic, Defendant's underwriter for Plaintiffs' policy, Dean was brought in to the discussion of the policy because the Medical Products Endorsement was "being knocked back and forth between the attorneys at Stryker and the broker and me." Kuchinic Dep. at 96, Def.'s Mot. Summ. J., Vol. H. Ex. 2 (Docket #533). Dean also testified that he discussed the Medical Products Endorsement with both Defendant, Plaintiffs and Plaintiffs' broker on multiple occasions. Dean Dep. at 77. Further, Plaintiffs concede that certain portions of the Medical Products Endorsement were altered in response to their concerns during the course of the negotiation. Plaintiffs argue that a comparison of the language originally drafted by Dean with the Medical Products Endorsement demonstrates that Plaintiffs did not negotiate the terms of the endorsement. While the language of both endorsements is substantially similar, this does nothing to refute the record evidence indicating that Plaintiffs did negotiate the policy and endorsement.

24

Accordingly, Plaintiffs' objection to the Magistrate Judge's rejection of a *contra proferentum* instruction is overruled.  The Court agrees with the Magistrate Judge that the *contra proferentum* rule has no application where the contract between the parties is the product of negotiation.[6]

Plaintiffs' final objections address the allocation of the burden of proof in Special Instruction Nos. 4 and 5.  Plaintiffs contend that both instructions improperly place the burden of proof on them.  Special Instruction No. 4 places the burden of proof on Plaintiffs to prove that the parties intended that the Medical Products Endorsement altered the terms of the main policy so that all claims and lawsuits related to a single batch of implantable medical products would be included in a single policy year, regardless of when bodily injury occurred.  Plaintiffs argue that the *contra proferentum* rule mandates that this burden be placed upon Defendant.

---

[6]Plaintiffs also contend that the Magistrate Judge erred in relying on cases applying the "sophisticated insured" exception.  To the extent that the cases cited by the Magistrate Judge mention a "sophisticated insured" exception, it is clear that the insured's sophistication is not the dispositive issue in determining whether to apply the *contra proferentum* rule, rather the issue is whether the contract was negotiated by the parties.  *See Newport Assocs. Dev. Co. v. Travelers Indem. Co. of Illinois*, 162 F.3d 789, 796 (3d Cir. 1998) ("[T]he dispositive question is not whether the insured is a sophisticated corporate entity, but rather whether the insurance contract is negotiated, jointly drafted or drafted by the insured.  In such instances, we conclude that the doctrine of *contra preferentum* should not be invoked to inure to the benefit of the insured.") (quoting *Pittston Co. v. Allianz Ins. Co.*, 124 F.3d 508, 521 (3d Cir. 1997)).  In this case, it is not Plaintiffs' status as a sophisticated business entity that precludes application of the *contra proferentum* rule, it is the fact that the parties negotiated the terms of the policy, in its entirety.

The Magistrate Judge thoroughly addressed and properly rejected this argument.  As stated previously, the Court agrees with the Magistrate Judge's conclusion that the *contra proferentum* rule is not applicable to this case.  Moreover, the Court also agrees with the Magistrate Judge that, even if the rule applied, under Michigan law the burden of proof on issues of coverage is always on the insured and the *contra proferentum* rule does not shift that burden to the insurance company.  As clearly demonstrated by the Magistrate Judge, Plaintiffs' reliance on out-of-state authority to support its argument is also misplaced.

Special Instruction No. 5 addresses the second special verdict question regarding whether each claimant suffered bodily injury during the relevant policy period.  The Magistrate Judge placed the burden of proving bodily injury during the policy period for each claimant on Plaintiffs.  This is consistent with the traditional allocation of the burden of proof applicable to the terms of an insurance policy.  *See Heniser v. Frankenmuth Mut. Ins. Co.*, 449 Mich. 155, 161 n. 6, 534 N.W.2d 502, 505 (1995) ("the 'insured bears the burden of proving coverage, while the insurer must prove that an exclusion to coverage is applicable.'") (quoting *Arco Indus. Corp. v. American Motorists Ins. Co.*, 448 Mich. 395, 424-25; 531 N.W.2d 168 (1995) (Boyle, J., concurring)), *Harvey Oil Co. v. Federated Mut. Ins. Co.*, 837 F. Supp. 242, 244 (W.D. Mich. 1993) (Bell, J.).  Plaintiffs contend that this case is part of an exceptional class of cases in which the burden of proof should be shifted to the insurance company to prove that a claimant did not suffer bodily injury during the policy period.

Plaintiffs rely on *Gelman Sciences, Inc. v. Fidelity and Cas. Co. of New York*, 456 Mich. 305,

572 N.W.2d 617 (1998), to support this position.

In *Gelman Sciences*, the Michigan Supreme Court adopted the "injury in fact"

approach to determining when coverage is triggered under a comprehensive general liability

insurance policy.  456 Mich. at 320-21, 572 N.W.2d at 623, *overruled on other grounds by*

*Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 664 N.W.2d 776 (Mich. 2003).  In discussing

this approach, the court noted that the determination of when injury actually occurred would

often be difficult.  *Id.* at 323, 572 N.W.2d at 625.  In apparent recognition of this difficulty,

the court noted that it may be necessary for courts to employ rules "designed to assist a

plaintiff in the face of an insurmountable burden of proof." *Id.* at 325 n. 12, 572 N.W.2d at

626.  The court then mentioned a case in which plaintiffs that ingested a prescription drug

manufactured by several companies were allowed to proceed against each manufacturer with

the burden of proving causation in fact shifted to each defendant.  *Id.* (citing *Abel v. Eli Lilly*

*& Co.*, 418 Mich. 311, 343 N.W.2d 164 (1984)).  Although the court expressly declined to

adopt a burden-shifting framework in the context of a comprehensive general liability

insurance policy, it did indicate that *Abel*'s approach was instructive on "how courts can

employ fair rules to alleviate an impossible burden when justice requires." *Id.*

To the extent that *Gelman Sciences* suggests that shifting the burden of proof to a

defendant is appropriate, it is clear that such action is reserved for situations in which a

plaintiff faces an impossible or insurmountable burden of proof. *Id.*  Such as where it is

impossible to determine which of a multitude of defendants caused a harm, the situation presented in *Abel*, or where it is difficult to pinpoint when property damage occurred over the course of a number of years of pollution, the situation presented in *Gelman Sciences*. Plaintiffs, in this case, are not faced with a similar insurmountable burden of proof. Plaintiffs rely on testimony from a medical expert who is expected to testify that a defective Uni-Knee begins to deteriorate as soon as the recipient begins placing weight on the knee. Because of this immediate deterioration, Plaintiffs contend that their expert will explain that bodily injury begins immediately and that the recipient may suffer bodily injury prior to any overtly visible symptoms. Plaintiffs reliance on this expert testimony to support shifting the burden of proof to Defendant proves too much. Unlike the situations mentioned in *Gelman Sciences*, it is not impossible for Plaintiffs to prove when bodily injury occurred for each claimant. On the contrary, Plaintiffs intend to produce medical expert testimony supporting the position that bodily injury occurs almost immediately after implantation of the defective device. Thus, it is not a question of whether it is *possible* for Plaintiffs to produce evidence of bodily injury during the policy period, but whether such evidence will be rebutted by Defendant or deemed incredible by the jury. Neither situation is of the same character as the impossible burden addressed in *Gelman Sciences* and does not warrant shifting the burden of proof from Plaintiffs to Defendant. Therefore, Plaintiffs objection to Special Instruction No. 5 is overruled.

Accordingly, with only the few minor clarifications set forth above, the Court overrules each parties' objections to the September 26, 2005 R&R and the October 14, 2005

R&R and approves and adopts each R&R as the opinion of the Court.  An order will be

entered consistent with this opinion.


Date:      July 14, 2006                    /s/ Robert Holmes Bell
                                            ROBERT HOLMES BELL
                                            CHIEF UNITED STATES DISTRICT JUDGE